STATE OF MAINE *vs*. PHILIP PARENTO.

Aroostook.    Opinion, February 7, 1938.

354

*George B. Barnes*, County Attorney for State.
*Albert F. Cook*,
*Herschel Shaw*, for respondent.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MANSER, JJ.

HUDSON, J.   The respondent, indicted with one John Walker for conspiracy (Walker has not been tried), appeals from the ruling of the presiding Justice refusing to set aside the jury's verdict of guilty. It is not necessary to recite the lengthy indictment. The County Attorney states its gist, saying: (they) "conspired and agreed together . . . that they would represent to Chasse and Ward that they had connections with the Judge of the Federal Court in Bangor through an attorney at law who practiced law in Bangor and who was a nephew of the Judge and that they could 'fix' Chasse's and Ward's cases for them for a consideration."

We have defined common-law conspiracy to be a combination of two or more persons, by concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means. *Cross et al. v. Peters*, 1 Me., 376, 388; *State v. Bartlett et al.*, 30 Me., 132, 134; *State v. Mayberry et al.*, 48 Me., 218, 235; *Franklin v. Erickson et al.*, 128 Me., 181, 182, 146 A., 437.

We also have statutory conspiracy.

"If two or more persons conspire and agree together, with the fraudulent or malicious intent wrongfully and wickedly to injure the person, character, business, or property of another, . . . or to commit a crime punishable by imprisonment in the state prison, they are guilty of a conspiracy." Chap. 138, Sec. 26, R. S. 1930.

The language of this indictment may be said to cover conspiracy both at common law and by statute.

"The conspiracy is the gist of the indictment, and though nothing be done in prosecution of it, it is a complete and consummate offence, of itself." *State* v. *Ripley et al.*, 31 Me., 386, 388.

". . . the gravamen of conspiracy is 'combination,' 'concerted action' and 'unlawful purpose.'" *State* v. *Vetrano et al.*, 121 Me., 368, 375.

"If the conspirators carry out, or attempt to carry out the object of the conspiracy, that fact may be alleged in aggravation of the offence, and given in evidence to prove the conspiracy." *State* v. *Mayberry*, supra, page 238.

". . . overt acts are laid merely as evidence of the principal charges." *State* v. *Murray et al.*, 15 Me., 100, 103.

Mr. Wharton says:

"Joint evil intent is necessary to constitute the offence. 'The confederation must be corrupt. This is implied in the meaning of the term "conspiracy."' And mere passive cognizance of a conspiracy is not sufficient to make a co-conspirator. There must be active cooperation, and when this exists the period when each party enters into the combination is unessential." Wharton's Criminal Law, 12th Ed., Vol. 2, Sec. 1608, page 1865.

"But it needs something more than a proof of mere passive cognizance of fraudulent or illegal action of others to sustain conspiracy. . . . There must be a concurrence in the common design. And we may also hold that mere sympathy with a conspiracy not exhibiting itself in overt acts does not make a

person a co-conspirator." Wharton, *supra*, Sec. 1671, page 1943.

"In the case of conspiracy, as with other common law crimes, it is necessary that criminal intent be shown." *Commonwealth* v. *Benesch et al.*, 290 Mass., 125, 194 N. E., 905.

A Federal officer arrested Chasse and Ward at Fort Fairfield for an alleged violation of the United States Liquor Tax Laws and ordered them to appear before the Federal Court in Bangor. Immediately Chasse attempted to get a conveyance for himself and Ward to that city, a distance of many miles. Arrangements first were made with one Campbell, but they were not carried out. Then Chasse telephoned Parento at Caribou, only to learn that he had no automobile. Walker, an owner of one, happened to be present during this telephone conversation and so, it being available, the respondent told Chasse that they would come to Fort Fairfield and take them to Bangor. It was decided to go that night. It took the respondent and Walker approximately three quarters of an hour to go to Fort Fairfield and the State contends that during that drive, or immediately before it, the conspiracy was conceived.

Ward knew neither the respondent, nor Walker, but Chasse, while unacquainted with Walker, had known the respondent for some twelve years and early in their acquaintanceship had worked for him for some four months. Since then their contacts had been few. Parento was well acquainted in Bangor, where Walker, a fight promoter, had his headquarters. There Chasse and Ward were practically strangers.

Upon their arrival in Fort Fairfield from Caribou, Walker was introduced to Chasse and asked him where he wanted to go and was told, "I got to go to Bangor." "What for?" he asked, and Chasse told him. Walker added: "I will fix you up." He then telephoned to Bangor and later said, "Boys, get ready. Going down to-night." They called at a filling station in Fort Fairfield for gas and oil. There the respondent (driver of the car because of the owner's eye trouble), attended to its supply. Walker asked Chasse and Ward to go into the filling station with him and there, not in the presence of the respondent, he received $50 from each. It was also there (according to Chasse's testimony) that Walker, still not in the presence of

the respondent, said that he would have to get them a lawyer in Bangor, that he "might fix it up himself" but he didn't dare,— "some account relation Judge and one thing and another . . . ."

Then the four resumed their journey to Bangor, where they arrived between three and four o'clock in the morning. Walker left them, while the other three stayed together at a hotel. Later that morning he brought to their hotel and introduced to them a Bangor lawyer and a bondsman. The services of the lawyer were secured, who represented Chasse and Ward before the Bail Commissioner that afternoon, when they furnished bail and were bound over to the November Term of the District Court. At the hotel Walker told them it was necessary for them to pay him more money. The attorney was present and heard this statement but not Parento. Chasse then gave Walker $100 and Ward $70. Ward wired home for additional money but it did not arrive before they started back that afternoon. While in Bangor, Ward made several trips to the telegraph office and at least once the respondent took him in the automobile, of which he was the driver on the whole trip. Of the money received, Walker paid the lawyer $25 and the bondsman $50. Chasse and Ward were told, both by the attorney and Walker, that it would be necessary for them to return to the Federal Court in November to defend the actions, which are still pending.

On their return to Fort Fairfield, they went to the telegraph office and the money wired to Bangor, and not there received by Ward, was paid to Ward, who of it gave Walker $30, but not in Parento's presence. Later that night, Walker collected $50 more from Ward. The total amount paid by Chasse and Ward to him, it is not denied (for it is not claimed that anything was paid by them to the respondent), was $305.

Two months later, Chasse and Ward had Walker arrested and most of the money paid to him was returned, he promising to pay the balance later. It is significant that no attempt was made either by Chasse or Ward to get the respondent to pay anything, although the evidence showed that he was accessible and could have paid, had demand been made of him.

At the time of the trial, Ward was dead. Chasse was the State's principal witness. A study of his evidence fails to reveal that he directly implicated this respondent as a conspirator.

Upon inquiry by the County Attorney as to whether in Bangor, or while driving home, Walker and the respondent talked about the Federal cases, Chasse said: "Walker talking" and that Parento did not say anything. "He drove the car."

These questions and answers appear in Chasse's testimony:

"Q. Did he (meaning Walker) tell you then that he would employ you a lawyer? Did he tell you there at the filling station he would get a lawyer for you?

A. Yes, sir.

Q. Did he tell you he would arrange bail for you?

A. Well, he says he will fix it up.

Q. So then, you and Mr. Ward each gave Mr. Walker, at that time, $50 apiece?

A. Yes.

Q. And Mr. Parento's name wasn't mentioned at all?

A. No."

     \*      \*      \*      \*

"Q. During all the time did Mr. Parento drive the car?

A. Yes, sir.

Q. Did he say anything to you or Mr. Ward—anything about paying him any money,—Mr. Parento?

A. No. . . ."

     \*      \*      \*      \*

"Q. You had asked him to take you down there because you knew that he was familiar with Bangor?

A. Yes.

Q. And he was a friend of yours?

A. Yes."

     \*      \*      \*      \*

"Q. Did Mr. Parento tell you that he could fix your case, down in Bangor, if you would give him money?

A. Not Phil. Walker."

     \*      \*      \*      \*

"Q. Now, at that time, did Mr. Walker say anything about having to have any money for Mr. Parento?

A. He said 'I have got to have some money' just so he will be down to go to work.

Q. Did he mention Mr. Parento's name?

A. No."

＊　　　＊　　　＊　　　＊

"Q. And Mr. Parento's name wasn't mentioned at all?

A. No."

＊　　　＊　　　＊　　　＊

"Q. During that time,—the trip back,—did Mr. Walker say anything about paying any money to Mr. Parento?

A. No, I didn't hear him say it.

Q. Did Mr. Parento say anything to you about having any of the money?

A. No."

Admittedly, except for an alleged admission (not confession), the respondent's conviction was secured wholly on circumstantial evidence. There was total lack of direct proof of a conspiracy. Still, "Conspiracies need not be established by direct evidence of the acts charged, but may and generally must be proved by a number of indefinite acts, conditions and circumstances. . . ." *State* v. *Vetrano*, supra, page 376.

The general rule as to sufficiency of proof by circumstantial evidence obtains in criminal conspiracy as in other crimes. 12 C. J., Sec. 233, page 639; *Nestor Johnson Mfg. Co.* v. *Goldblatt*, 265 Ill. App., 188; *Commonwealth* v. *Bardolph et al.*, 192 A., 916 (Pa.); *Rosenblum* v. *Rosenblum et al.*, 181 A., 583 (Pa.). In the Bardolph case, the court quoted from an earlier Pennsylvania case as follows (see page 920):

"An unlawful combination, like any other substantive fact, must be established by sufficient evidence. Where it is direct and positive, the question of sufficiency is answered. The jury may then pass on the credibility of the witnesses. But, when a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to a moral certainty

every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence."

In dealing generally with proof of guilt by circumstantial evidence, Justice Whitehouse in the leading case of *State* v. *Richards*, 85 Me., 252, 254, 27 A., 122, 123, said:

"But before it is deemed sufficient to warrant conviction in a criminal case (no exception is made as to a criminal conspiracy) its accuracy and soundness must be negatively tested by inquiring whether it excludes every other hypothesis than than of guilt. It is not sufficient that the circumstances are all consistent with the defendant's guilt, and raise a strong probability of it; they must also exclude beyond a reasonable doubt the hypothesis of his innocence and be incapable of explanation upon any other reasonable hypothesis than that of his guilt."

Other pertinent principles of law may be restated.

"The humane presumption of the law is against guilt and though a conspiracy must ordinarily be proved by circumstantial evidence, yet it is not to be forgotten that the charge of conspiracy is easily made, . . . . Mere suspicion, possibility of guilty connection, is not to be received as proof in such a case. . . ." *Benford* v. *Sanner*, 80 Am. Dec., 545.

"On the other hand, conspiracies can not be established by a mere suspicion, nor does evidence of mere relationship between the parties or association show a conspiracy." 12 C. J., Sec. 231, pages 638, 639; *People* v. *Long*, 93 Pac., 387; *Glass* v. *Commonwealth*, 61 S. W. (2nd), 629 (Ky.).

"Her coming in company with the others, while well calculated to excite suspicion, was no evidence that she knew or suspected that they, or either of them, had any design to steal. Her so coming in was consistent with her entire innocency, and being so was not proof of guilt." *Ormsby* v. *People of the State of New York*, 53 N. Y., 472, 475.

Do the facts claimed to have been proven by the State "exclude beyond a reasonable doubt the hypothesis of" this respondent's "innocence" and are they "incapable of explanation upon any other reasonable hypothesis than that of his guilt?" *State* v. *Richards*, supra.

Equally consistent with the respondent's innocence as his guilt were the particular circumstances relied upon by the State, viz., the procuring of Walker's automobile and the driving of it by Parento; friendship between the latter and Chasse; Parento's familiarity with Bangor and acquaintance with a Bangor attorney but not the one employed by Walker; an opportunity to enter into a conspiracy in the time it took to drive from Caribou to Fort Fairfield; the collection of money by Walker from Chasse and Ward in Fort Fairfield, and later in Bangor and Fort Fairfield (not in any way participated in by this respondent); the respondent being with Chasse and Ward in Bangor while "Walker absented himself"; statements by Walker not in the respondent's presence and the conveyance of Ward by the respondent to the telegraph offices in Fort Fairfield and Bangor.

The State contends that the alleged conspirators agreed that the overt acts should be performed only by Walker, but of this the record is entirely devoid of proof. Neither is there sound reason for the making of such an agreement. The respondent as a friend of Chasse's, one would expect, would be active rather than passive, had he been an actual conspirator.

A Federal officer testified that upon being accused by an Assistant United States District Attorney the respondent admitted that Walker and he "split" money received by Walker from Chasse and Ward and that this admission was made in the presence of a probation officer, Chasse, Ward and the Bangor attorney. Of the alleged admission there was no testimony excepting that of the Federal officer. Chasse did not so testify. The Bangor attorney testified that he had no recollection of any such admission. At most it was not a confession but, if made, only an admission of a fact, equally as consistent with innocence as guilt. It simply admitted the splitting of money received for lawful purposes, viz., transportation and arrangement of bail. Considering the long distance from Fort Fairfield to Bangor, the necessary legitimate expenditure of

money, the time required for the trip, the employment and payment of services of an attorney, the securing and purchase of bail (it might have become necessary to furnish cash bail), the amount paid was not so great as to arouse more than suspicion.

Other facts pointed toward innocence, viz.: The actual employment of an attorney of character to represent Chasse and Ward in the Federal Court and conduct their cases therein; none of the attorney's conversations and dealings had with Parento; Walker's demand of additional money from Chasse and Ward in a hotel in the presence of a third party, a reputable attorney; the attorney's later letter to Chasse asking a payment of fifty dollars for future services — (he did not communicate either with the respondent or Walker); lack of evidence of any incriminating conversations between the respondent and Chasse, Ward or Walker; no evidence, however little, upon the part of Chasse or any other State witness implicating the respondent to show what it was intended he should do illegally for money paid or to be paid; no testimony showing that the Federal cases were ever talked over by the respondent and Chasse or Ward while in Bangor or on the trip to and from Bangor; the forced return of the money from Walker alone, even with the assistance of a criminal warrant, and no attempt being made to compel the respondent to pay any of it to Chasse or Ward, although he had the ability so to do if he had received any of it and were criminally liable; Walker's wife coming all the way from Biddeford to Fort Fairfield to furnish the money and make it possible for him to return practically all of it to Chasse and Ward. If the respondent were implicated in a conspiracy with Walker and the money had been paid to him for their joint benefit, the respondent having received his part, it is hardly conceivable that Walker would not at least have attempted to get the respondent to contribute his part to be returned or at least to make up Walker's deficiency. Other circumstances might be mentioned tending to prove the respondent's innocence but it is unnecessary.

Certainly a conspiracy to commit a criminal offense, and especially one whose purpose is to interfere with the prosecution of crime, is most reprehensible and should be severely condemned by the court, but it is equally important that one so accused shall have full benefit of all rights accorded to him by law, the least of which is not

that presumption of innocence until proven guilty beyond a reasonable doubt by legally sufficient evidence.

Neither the alleged admission nor the circumstantial evidence submitted to the jury was sufficient to warrant its verdict.

*Appeal sustained.*
*New trial ordered.*