STATE OF MAINE
*vs.*
FREDERICK W. PAPALOS

Cumberland.    Opinion, February 11, 1955.

*Alexander A. LaFleur, Attorney General,*
*James Archibald,*
*Boyd L. Bailey,*
*Miles P. Frye, Asst. Attorneys General,* for State.

*Berman, Berman and Wernick,* for respondent.

SITTING: FELLOWS, C. J., WILLIAMSON, TIRRELL, WEBBER, BELIVEAU, TAPLEY, JJ.

WILLIAMSON, J. The respondent, Frederick W. Papalos, was found guilty of conspiring with Herman D. Sahagian to bribe Bernard T. Zahn, chairman of the State Liquor Commission. The case is before us (1) on two motions for a new trial upon the ground of newly discovered evidence, (2) on appeal, and (3) on fourteen exceptions to rulings made by the presiding justice in the Superior Court during the trial.

The indictment charges the crime of conspiracy in the following language:

> "Frederick W. Papalos . . . and Bernard T. Zahn
> . . . at Portland in the County of Cumberland and
> State of Maine, on the twenty-third day of Oc-
> tober, in the year of our Lord, one thousand nine
> hundred and fifty-one, feloniously did combine,
> conspire and agree together with . . . Herman D.
> Sahagian . . . to commit a crime punishable by
> imprisonment in the State Prison to wit: to com-
> mit the crime of bribery . . . the said Frederick W.
> Papalos and the said Herman D. Sahagian to offer
> and give to . . . Bernard T. Zahn . . . an executive
> officer to wit: the duly appointed and qualified
> Chairman of the State Liquor Commission of the
> State of Maine, and the said Bernard T. Zahn to
> accept, a gratuity and valuable consideration with
> intent to influence his action, opinion and judg-
> ment in the discharge and performance of his du-
> ties as Chairman of said State Liquor Commis-
> sion aforesaid . . ."

Sahagian, the chief witness for the State, was not in-
dicted. The respondent and Zahn pleaded not guilty and
were tried jointly. Zahn rested his case at the close of the
State's case, and moved unsuccessfully for a directed ver-
dict. The respondent presented evidence, including his own
testimony, in defense. The jury acquitted Zahn and found
the respondent guilty.

It is unnecessary that we review the evidence in detail.
In substance the story at the trial was this:

Sahagian was the president and treasurer of the Fair-
view Wine Corporation. For purposes of the case we may
speak of the business of the corporation as the business of
Sahagian. His principal customer was the State Liquor
Commission. In 1951 he became disturbed at rumors that
his corporation would lose its license with the Commission
because of a false statement made by him with respect to a
conviction of felony in another state many years in the past.
He first received this information from the respondent. He

was concerned with the "delisting" or removal of certain of his products from the list of wines sold in the state stores. There were rumors that the Commission would discontinue ordering wine in certain size containers to his detriment. He was troubled by price competition.

The respondent, formerly a resident of Maine and then in business in Boston, entered the picture to assist in solving the difficulties with the Liquor Commission, and from July to October 1951 had several conversations with Sahagian. During the conversations, to use the words of respondent's argument:

> ". . . Papalos had repeatedly represented to Sahagian that he (Papalos) had been in touch with Bernard T. Zahn, Chairman of the Maine State Liquor Commission, and that Zahn had agreed with Papalos, and wanted Papalos to tell Sahagian, that Zahn would accept a share of money paid by Sahagian to Papalos; that he (Zahn), in return for his share of the money paid by Sahagian, would favor Sahagian in various respects regarding the prices of wines, the listings of wines, and ensuring that Sahagian's wines would never run out of stock in the liquor stores.

> "All of these conversations between Papalos and Sagahian took place in the absence of Zahn. Papalos, himself, on the witness stand, denied categorically that he had ever talked with Zahn about Zahn's receiving any money or other thing of value as a bribe in order to favor Sahagian. He further denied, categorically, that he had ever offered any money to Zahn in any respect or for any purpose, and he said on the witness stand that he never entertained any intention of undertaking, at any time, to approach Zahn with a bribe. Papalos admitted in his testimony that he had made such representations to Sahagian but that in fact they were only so much 'wild talk'—for the purpose of keeping Sagahian favorable toward Papalos, especially since Sagahian seemed so willing to pay

money to Papalos if there was any mention of influence."

A contract between Sahagian's company, signed by Sahagian, and the respondent dated October 23, 1951, was executed and left in escrow with an attorney to become effective when and if there should be an increase in the price of wine sold the Commission. Under the contract the respondent received the "exclusive right within the State of Maine to sell all products sold by the Company" with a commission per case at stated rates. Shortly thereafter the price was increased, and the contract in terms became effective. From October 1951 to February 1952, when Sahagian refused to make further payments under the contract, Sahagian's company paid the respondent over $12,000.

Before his agreement with the respondent and before paying him any money, on the advice of Mr. Stanley Bird, an attorney, Sahagian informed the Chief of the State Police that an unnamed individual had approached him for money to use to pay graft and obtain influence. The suggestion by the Chief of the State Police that marked money be used did not meet with Sahagian's approval. At no time did Sahagian name any individuals.

Sahagian, on cross-examination, testified:

"Q.   This thought of paying graft was repugnant to your nature, wasn't it?
"A.   It was definitely against my nature, if I could help it.

"Q.   And you would never intend, deliberately and knowingly, to pay anyone graft, would you?
"A.   Before I answer that yes or no—there is a clause in that. If it was a matter of my business or my investment that I have to protect I would not only pay graft but I would do anything and everything to protect my business, protect my investment and protect my lifetime savings.

"Q. You would even resort to bribery to do that?

"A. Yes. I had no alternative.

"Q. Is it your statement that when Mr. Papalos came to you and talked with you about paying money, that you called it 'graft' in order to get influence, you deliberately and knowingly entered into a conspiracy to accomplish that?

"A. I most certainly did.

"Q. And you did it, intending to commit a crime?

"A. I did."

\* \* \* \* \* \* \* \* \*

"Q. And so you pretended to go along, hoping that he (Papalos) would feed you with evidence?

"A. That is right.

"Q. And when you paid him the money you paid him the money because you were still pretending to take part in this scheme even though you really never intended to go through with it? You wanted the evidence; isn't that right?

"A. That is correct. I was after evidence. I answered that question several times. I was after evidence and it is all I was after."

\* \* \* \* \* \* \* \* \*

"Q. And by pretending to be a part of this scheme?

"A. There was no such a thing as pretending. I became a part of it. I didn't care what the consequence was. If I had to go to jail I am willing to accept it. I had to do it to protect my business.

"Q. You took the precautions about going to jail first by talking with Mr. Bird and by talking with the Chief of the State Police before you undertook it; isn't that true?

"A. I didn't do that for any protection reason. I just went and told them.

"Q. You wanted to be sure you were on record that you were not doing anything wrong; isn't that right?

"A. Naturally."

\* \* \* \* \* \* \* \* \*

The respondent's defense at the trial, broadly stated, was that although Sahagian and the respondent each believed the other was a conspirator, nevertheless neither had the evil intention essential to a conspiracy to bribe Zahn, for Sahagian was only securing evidence to expose corruption and the respondent was simply cheating Sahagian.

We are here concerned with the crime of conspiracy.

> "We have defined common-law conspiracy to be a combination of two or more persons, by concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means." *State of Maine* v. *Parento,* 135 Me. 353, 354, 197 A. 156 (1938).

The statutory crime of conspiracy is defined as follows:

> "If two or more persons conspire and agree together, with the fraudulent or malicious intent wrongfully and wickedly to injure the person, character, business, or property of another; . . . or to do any illegal act injurious to the public trade, health, morals, police, or administration of public justice; or to commit a crime punishable by imprisonment in the state prison, they are guilty of a conspiracy, and every such offender, and every person convicted of conspiracy at common law, shall be punished by a fine of not more than $1,000, or by imprisonment for not more than 10 years." R. S. c. 117, § 25 (1944).

Bribery of the Chairman of the Liquor Commission is a crime punishable in state prison under the general statute relating to bribery and acceptance of bribes by public officials. R. S., c. 122, § 5 (1944).

This indictment was directed to the statutory crime. A careful review of the legal principles may be found in the *Parento* case, *supra.*

## First Exception

The court excluded the following question asked of Sahagian:

> "So someone came and told you about this meeting between the Research Committee, the sub-Committee of the Legislative Committee in charge of Legislation, and the Liquor Commission with regard . . . to the investigation of the falsification of your liquor application; is that true?"

The respondent urges that this question was "an additional link in this chain of defense" described in the bill of exceptions in these words:

> "This interrogation (concerning various items of information which Sahagian had been obtaining from other persons than the respondent) was for the purpose of building up a claimed defense that Mr. Sahagian had not really relied on Frederick W. Papalos, or on what Frederick W. Papalos had been telling him and that he was not really seeking to obtain influence through Frederick W. Papalos, but that throughout his relationship with Mr. Papalos Mr. Sahagian was merely leading Mr. Papalos on, to 'bleed' him of whatever information Mr. Papalos could reveal, to bait Mr. Papalos and to trap him — as well as others — all as part of a scheme in which Mr. Sahagian was pretending to be a crook and a conspirator in order to obtain evidence of possible wrong-doing and corruption and thereby to expose and eliminate certain persons against whom he held grievances."

The record immediately following the excluded question reads:

> "Q. In any event, you knew that such a meeting had taken place?
> ". . . .
> "A. The answer is generally Yes, but it needs an explanation. If, after I explain it, it is very clear—

"MR. WERNICK: If the Court please, I submit the witness may explain when his counsel goes into redirect. He has answered my question."

Furthermore, Sahagian later stated who had told him about the meeting between the Liquor Commission and Research Committee. The respondent was in no way prejudiced by the ruling of the presiding justice. *State* v. *Wombolt*, 126 Me. 351, 138 A. 527 (1927) ; *State* v. *Caruso*, 129 Me. 492, 493, 151 A. 439 (1930) ; *State* v. *Stuart*, 132 Me. 107, 167 A. 550 (1933). The exception is overruled.

## SECOND EXCEPTION

The respondent objected to the exclusion of the following question:

"I am calling your attention, Mr. Sahagian, to the year 1952, sometime in the spring of 1952, and I ask you whether there was an incident some time then in which you requested Byron Nichols to obtain some information for you from the Liquor Commission?"

This question relates, it is to be noted, to a time after the conclusion of the conspiracy. For this reason alone the exclusion was proper. Furthermore, the record discloses that the subject matter was covered in detail by Byron Nichols. If we assume the question was technically admissible, nevertheless the respondent has failed to show any prejudice from the ruling. The exception is overruled.

## THIRD EXCEPTION

A series of questions asked of Sahagian on cross-examination about details of the felony mentioned in the statement of facts were excluded. The respondent excepted on the ground that he sought thereby not to impeach the credibility of the witness by proof of crime but, to quote from the record:

"To impeach the witness by showing his statement that Mr. Papalos told him all these things could not possibly have been true, that the details that Mr. Papalos related were such that only Mr. Sahagian could have told him about them."

Sahagian testified that the respondent first mentioned the felony charge and the false affidavit on the application before the Liquor Commission. The respondent denied this statement and gave a complete version of the incident. The respondent has failed to convince us that he was prejudiced by the ruling. The exception is overruled.

## FOURTH EXCEPTION

The respondent objected to the exclusion of excerpts from the transcript of two meetings of the sub-committee on Liquor of the Legislative Research Committee, and the members of the State Liquor Commission held on July 5, 1951 and August 21, 1951.

In his brief the respondent says:

"Such evidence would tend to show, once again, that Papalos was not the only person known to Sahagian who had heard about the license difficulty in which Sahagian was involved; that Sahagian was not really relying on Papalos but might have been using other persons who were in possession of power and influence, to furnish him with information and to protect him against possibly unjust discrimination; that, therefore, Sahagian was only pretending to be relying on Papalos in order to procure evidence and to set a trap, not only for Papalos, but for other persons who were in public office and against whom Sahagian had grievances."

Passing questions of admissibility, we conclude that the excerpts have no weight in the cause. That Sahagian did not rely solely upon the respondent for the facts is shown in the following testimony:

"Q. Did you ask anyone in the Commission for the true facts? Did you ask anybody connected with the Liquor Commission the true facts?
"A. Yes, I did.

"Q. Who?
"A. When Mr. Papalos told me that my license was going to be revoked I went down to Mr. Tabb and Mr. Tabb went to the Liquor Commission to find out if it was so because Mr. Papalos had dared me and asked me to check on it. He said, 'I am telling you the truth.' He said, 'I want you to send somebody up there so you will know I am telling you the truth.' It was on that promptness I asked Mr. Tabb and Mr. Tabb went out and got both of the other Research Committee members with him and Mr. Jalbert came back and he told me all about it, and as I stated before, I have a wire recording of every word Mr. Jalbert said to me. There was no need of me going any further because I already had the information."

The exclusion of the evidence was in no way harmful to the respondent. The exception is overruled.

The FIFTH and SIXTH EXCEPTIONS were abandoned.

### SEVENTH EXCEPTION

During cross-examination by the State, the respondent testified that a record had been played to him in the office of Mr. Bird in Waterville. The respondent was then asked the following question:

"Whether it was your voice and Sahagian's voice that you heard when those records were heard when the records were played to you."

Objection was taken on the ground that the line of inquiry was "entirely improper" and that the State was "trying to introduce evidence in an indirect manner which cannot be introduced secondarily in this way." The attorney for the

State informed the court: "I am at this stage introducing nothing. I am laying a foundation." The witness answered:

"It sounded like my voice." Whether the recordings should be introduced in evidence was a matter for determination when and if offered. We test the propriety of the ruling in light of the situation at the time the objection was taken. We do not consider the acts complained of in the EIGHTH EXCEPTION in passing upon the ruling in the SEVENTH EXCEPTION. The exception is overruled.

### EIGHTH EXCEPTION

During cross-examination of the respondent by the State, and following the evidence discussed in the SEVENTH EXCEPTION, the State examined the respondent at length by questions plainly based upon documents furnished to him by Mr. Bird sitting at the table with counsel for the prosecution. An example of the type of questions and answers are the following:

> "Q. Do you remember telling Mr. Sahagian sometime in October, 1951, making this statement or a similar statement to Mr. Sagahian in your discussion of this alleged contract, 'I have told you the truth, see. I also told you this and I want you to think about it very carefully, Herman, because I am going to, we are going to continue to do business. I want a written contract with me.' Did you make that statement to Sahagian?"
> "A. I wanted a written contract? Certainly."
>
> "Q. Do you remember you made a statement similar to that to him?"
> "A. Mr. Niehoff, I made so many statements to Mr. Sahagian I could not remember everything I said to him. The fact there was an agreement made is evidence of the fact."

The EIGHTH EXCEPTION is to this entire line of testimony. The respondent in effect says the State wrongly

introduced as evidence the contents of a recording by reading it to the respondent and that thereby he was materially prejudiced.

In our view there was no error on the part of the presiding justice in permitting the cross-examination or in refusing to order that counsel for the respondent be given an opportunity to see and examine the papers from which counsel for the State was conducting his examination. The court said, and we approve: "If the witness cannot answer the question all he has to do is say he doesn't understand it ... Questions are being put to the witness and if the witness cannot answer them he may say so, always."

The answers of the respondent throughout the long cross-examination show that he was thoroughly familiar with the subject matter. We find that there was no danger that the jury would regard the questions and not the answers by the respondent as the substance of the evidence. Much must be left to the discretion of the trial judge in matters of this nature. The respondent has failed to show there was an abuse of discretion in the rulings by the presiding justice. The exception is overruled.

## NINTH EXCEPTION

Exception was taken to the denial of respondent's motion for mistrial based on abuse of discretion in permitting the tactics of the prosecution described in the SEVENTH and EIGHTH EXCEPTIONS. The respondent does no more than raise again the questions considered under the exceptions noted in which we found no error. The exception is overruled.

## TENTH EXCEPTION

After Zahn rested and his motion for a directed verdict was denied, the respondent called Zahn as a witness in his

behalf.. The presiding justice ruled correctly that Zahn was incompetent to testify. The exception must be overruled.

The entire record on the point under discussion reads:

"MR. WERNICK:    I will call Bernard Zahn.

"MR. NIEHOFF:   We object to the competency of this witness at this time, and would like to state our reasons in the absence of the jury.

"MR. WERNICK:   May I state for the record, if the Court please, that I am calling Mr. Zahn insofar as I represent the respondent, Papalos, and I call him as a witness to testify in that regard.

"THE COURT:   Do you wish to be heard further in Chambers, Brother Niehoff?

"MR. NIEHOFF:   Yes, Your Honor."

### (In Chambers)

"MR. NIEHOFF:   May it please the Court, the State objects to the competency of Bernard T. Zahn appearing as a witness in this case. The record discloses that the proceedings before the jury is on a joint indictment wherein Papalos and Zahn are co-defendants. The record further discloses that the Respondent Zahn rested his defense. It now appearing that his co-defendant Papalos has called the defendant Zahn as a witness in a trial of the issue in the same indictment before the same jury, the State contends that Section 22 of Chapter 135, Revised Statutes of 1944 sets forth the only method and conditions upon which the accused may testify. The statute says that in all criminal trials the accused shall, at his own request but not otherwise, be a competent witness. The State further contends that the defendant Zahn had an opportunity during the trial of the cause to avail himself, at his request, to testify. He has waived that right by resting his case. He cannot now be a competent witness called by his co-defendant Papalos.

"THE COURT: Do you wish to say anything for the record, Brother Wernick?

"MR. WERNICK: I suppose there is no need to say anything for the record except to note my exception to Your Honor's ruling, which I do.

"THE COURT: Yes.

"MR. WERNICK: I suppose I am premature. Your Honor has not ruled yet?

"THE COURT: I have indicated what my ruling would be.

"MR. WERNICK: I was simply going to offer Mr. Zahn for the purpose of having him testify in regard to these matters in which he is alleged to have participated as co-conspirator with Papalos and Sahagian and we were intending to prove through him that he never had any conversation whatever with either Sagahian or Papalos about taking money or anything of value, that he never had any contact with either of them with regard to any attempts to influence him nor did he know of any such thoughts or ideas that might have been in the mind of anyone about trying to influence his judgment by offering him anything of value for that purpose."

(In the Court Room)

"THE COURT: The Court is of the opinion Mr. Zahn cannot properly testify in behalf of Mr. Papalos in this case, and so the offer of Mr. Zahn as a witness must be denied."

(Exception noted for Respondent Papalos)

"MR. KNUDSEN: May it appear for the record that Mr. Zahn and counsel do not object to his appearing to testify.

"MR. WERNICK: On behalf of the Respondent Papalos, I rest, subject to right of sur-rebuttal."

The issue lies in the competency of the witness, not in the materiality of the evidence offered.

When the Court ruled, there was nothing whatever in the record to disclose that Zahn had made a request or indeed was willing to testify. Thus, the ruling was correct upon the record when it was made.

Our statute reads:

> "Sec. 22. **Respondent may testify; not compelled to incriminate himself; failure to testify; husband or wife may testify . . .** In all criminal trials, the accused shall, at his own request but not otherwise, be a competent witness. He shall not be compelled to testify on cross-examination to facts that would convict, or furnish evidence to convict him of any other crime than that for which he is on trial; and the fact that he does not testify in his own behalf shall not be taken as evidence of his guilt. The husband or wife of the accused is a competent witness." R. S. c. 135, § 22 (1944).

It is familiar law that the accused was not a competent witness at common law. Maine led the way in permitting the accused to testify in P. L., 1864, c. 280, "said by Professor Thayer (Cases on Evidence, 2d Ed., p. 1117) to be 'the earliest statute permitting the defendant in a criminal case to testify.'" 2 Wigmore on Evidence, 3rd Ed. § 579. There must be no element of compulsion to make the accused take the witness stand. He must not be forced to elect whether he will testify. Competency rests upon the statute and depends upon compliance with the words "at his own request but not otherwise." "He is made simply 'at his own request, but not otherwise,' a competent witness." *Wolfson* v. *U. S.*, 101 F. 430 (5th CCA 1900).

The competency statute is applicable in the joint trial of co-indictees. Each may be a witness for himself, for a co-indictee, or for the State, provided his testimony is given at his own request, but not otherwise. *State* v. *Barrows,* **76** Me. 401 (1884); *Wolfson* v. *U. S., supra;* 2 Wigmore on Evidence (3rd Ed.) § 580.

Whether the statement by counsel for Zahn was a request within the meaning of the statute need not be decided by us: If it was not a request, then the ruling was correct for, as we have seen, Zahn in the absence of a request would not have been a competent witness. On the other hand, if we view the remarks by counsel as an expression of willingness to testify and such willingness as a request, then the respondent is faced with the fact that the ruling by the court was made prior to any "request" by the witness, and further that nothing was done by either Zahn or by the respondent to call again the issue to the attention of the court.

In brief, the question of Zahn's competency insofar as the court is concerned ended with the ruling, which as matters then stood was unexceptionable. It could not be reopened merely by a subsequent statement of counsel of a willingness to testify. Thereafter no affirmative action was taken by respondent which would require an additional ruling of the court nor was any further exception noted.

### ELEVENTH EXCEPTION

The respondent excepted to the denial of his motion for a directed verdict of not guilty at the conclusion of the evidence. The theory of the motion was: (1) that Zahn was entitled to a directed verdict, and (2) that therefore under the indictment and on the evidence the respondent could not be guilty of conspiracy with Sahagian to bribe Zahn. Zahn was in fact acquitted by the jury. It is sufficient to say that whether Zahn was entitled to a directed verdict was a matter between Zahn and the court in which the respondent was not an interested party. The second point is covered in the TWELFTH and THIRTEENTH EXCEPTIONS. The ELEVENTH EXCEPTION is overruled.

### TWELFTH AND THIRTEENTH EXCEPTIONS

In the TWELFTH EXCEPTION the respondent objects to the refusal of the presiding justice to charge that if Zahn was

not guilty then the respondent must be acquitted. The same issue is raised in the THIRTEENTH EXCEPTION to the instruction that the jury could find Zahn "not guilty" and the respondent "guilty." In effect, the respondent requested a directed verdict in event Zahn was acquitted.

The respondent first attacks the indictment in these words from his brief:

*"Under the indictment, it was not possible for the jury to be permitted to return a verdict of 'not guilty' for Zahn and a verdict of 'guilty' against Papalos. The indictment alleges but a single conspiracy and one in which the respondent, Zahn, was an essential and indispensable party. The proof of a conspiracy between Sahagian and Papalos, without Zahn, would constitute a fatal variance."*

For the reasons set forth under the FOURTEENTH EXCEPTION, we hold the indictment was a proper vehicle for a charge of conspiracy between Sahagian and the respondent to bribe Zahn, without the participation of Zahn. With Zahn eliminated by the verdict, the charge of conspiracy remained against Sahagian and the respondent.

The second argument is directed to the sufficiency of the evidence. The respondent's position is stated as follows:

"According to the direct evidence, then, there could be a finding of a *genuine common* purpose and *meeting of the minds* between Sahagian and Papalos *only if the complicity of Zahn in the conspiracy is accepted. Zahn's actual participation in the conspiracy was the foundation and inducement of the entire project between Sahagian and Papalos.* The Court's instruction to the jury that, on the evidence, the jury could acquit Zahn and yet convict Papalos (of conspiring with Sahagian to implicate Zahn at some future time, all of this being unknown to Zahn,) was, therefore, a contradiction of all the direct, categorical, and undisputed evidence in the case."

The acquittal of Zahn is of course a finding that Zahn did not join the evil project. If the actual participation of Zahn in the conspiracy was essential to the proof of a conspiracy by the respondent and Sahagian, then the court was in error in the rulings.

The conspiracy of Sahagian and the respondent does not rest upon the participation of Zahn in fact. Without entering into details, the jury could properly make the following significant findings:

The respondent induced in Sahagian the belief that Zahn was implicated prior to the October agreement between Sahagian and the respondent. Zahn was a public official whom Sahagian believed could be bribed. From the agreement, and the other evidence including in particular the meetings of the respondent and Sahagian, it was the understanding on the part of Sahagian that Zahn would be paid for future benefits from the commissions received by the respondent on the sale of Sahagian's wines to the State Liquor Commission. The intention of Sahagian to enter into a conspiracy with the respondent to bribe Zahn could be based upon a belief in, as well as upon the fact of, Zahn's implication.

The essential evil intention on the part of the respondent is not negatived by the innocence of Zahn. It does not follow therefrom that the respondent did not intend to bribe Zahn when the October agreement was made with Sahagian. The jury did no more it would seem than accept his statements of intention directed to Sahagian.

In short, the respondent asserts he was not telling the truth and therefore his intention however clearly expressed in words did not exist as a fact.

From the entire record we conclude it was a question of fact for the jury whether Sahagian and the respondent both intended to agree to bribe Zahn, or in the case of Sahagian,

only to uncover corruption, or in the case of the respondent, only to cheat Sahagian.

The jury, in reaching its decision, necessarily considered the fact of Zahn's freedom from guilt, and the lack of evidence that either Sahagian or the respondent approached Zahn. The weight to be given such evidence in a search for the intention of the respondent and Sahagian was for the determination of the jury. We have found no compelling reason for holding that the jury having acquitted Zahn could not find the respondent to be guilty.

The rulings were correct, and the exceptions are overruled.

### FOURTEENTH EXCEPTION

The respondent excepted to the denial of his motion in arrest of judgment on the ground that the indictment failed to set forth the crime of conspiracy. The alleged deficiency in the indictment may properly be raised by such a motion. *State* v. *Beattie,* 129 Me. 229, 151 A. 427 (1930).

The argument of the respondent is that "a preliminary combination, or agreement, aimed at the *giving and receiving* of a bribe made by *only* the prospective givers and the prospective taker of the bribe, cannot amount to a criminal conspiracy, since the ultimate acts of giving and receiving a bribe themselves involve concert of action, agreement and combination."

The effect of a verdict in favor of Zahn was to remove him from the case. With Zahn stricken from the indictment, that is from those parts in which he allegedly is an actor, there is left a sufficient charge of conspiracy against Sahagian and the respondent. Prospective givers alone are thus charged with a conspiracy. The prospective taker has been eliminated. Where the indictment contains surplusage as shown by the verdict, the offending words may be

stricken and the motion denied if the remainder charges a crime. *State* v. *Chartrand,* 86 Me. 547, 30 A. 10 (1894). Where concurrence between giver and taker is required to establish the substantive crime of bribery, it is argued that it is improper to deal with that same substantive offense under the guise of conspiracy. But whatever may be the rule in other jurisdictions, in this state and under our statute *(supra),* concurrence is not required to establish a substantive crime of bribery. *State* v. *Vallee,* 136 Me. 432, 12 A. (2nd) 421 (1940). And where the concurrence and agreement, essential to conspiracy but not to bribery, are shown to exist between prospective givers, the crime is properly charged as conspiracy. The exception is overruled.

### THE APPEAL

There are two principles governing the review of criminal appeals. First, the general rule set forth in *State* v. *Morin,* 149 Me. 279, 100 A. (2nd) 657 (1953), at page 282, as follows:

> ". . . the only question before the court on an appeal from the denial of a motion for a new trial is whether in view of all the testimony the jury were warranted in believing beyond a reasonable doubt and therefore in declaring by their verdict that the respondent was guilty as charged."

Second, the exception to the rule that ". . . where, and only where, manifest error in law has occurred in the trial of cases and injustice would otherwise inevitably result, the law of the case may be examined upon a motion for a new trial on the ground that the verdict is against the law, and the verdict, if clearly wrong, set aside." *State* v. *Wright,* 128 Me. 404, 148 A. 141 (1929), quoted with approval in the *Morin* case.

Under the exception, it is urged that the appeal should be sustained on the ground that the presiding justice erred

in denying Zahn's motion for a directed verdict. If the verdict had been directed for Zahn, he would have been freed from any restrictions upon his competency as a witness under the statute discussed in the TENTH EXCEPTION, and thus would have been available as a witness for the respondent.

An objection to the refusal to direct a verdict for Zahn, however, cannot be raised by his co-respondent Papalos. We are asked, after the jury has acquitted Zahn, to hold that the respondent was harmed by a ruling in no way directed to his case, and which, assuming error, was corrected by the verdict. Must we examine the Zahn case to determine if error existed, when the jury has ended the matter? We think not.

For a second ground of appeal under the general rule, the respondent again raises the question that with the acquittal of Zahn, the jury was not warranted in finding the respondent guilty of conspiracy with Sahagian to bribe Zahn. The respondent in his brief states in effect that the issue is presented on appeal lest the court be unable to consider it under EXCEPTIONS TWELVE and THIRTEEN, to which we are referred for his argument. The issue was fully and completely brought before us by the exceptions noted. The appeal is dismissed.

### MOTIONS FOR NEW TRIAL ON THE GROUND OF NEWLY DISCOVERED EVIDENCE

The two motions may be treated for convenience as one. The evidence has been "certified to the Law Court for determination." R. S., c. 94, § 15 (1944). The controlling principles are found in *State* v. *Casale*, 148 Me. 312, 320, 92 A. (2nd) 718 (1952).

The argument of the respondent in substance is this: first, that since the trial Sahagian has repudiated his testi-

mony that he acted with an evil and corrupt or criminal intent; second, that Sahagian falsely concealed his promised immunity; third, that the State improperly concealed the promised immunity of Sahagian from the respondent.

The testimony of Sahagian was vital to the State's case. Unless his testimony was believed, the respondent could not have been convicted. Without a criminal intent on the part of Sahagian, there was no conspiracy.

On the question of repudiation of evidence of criminal intent, we have the testimony of Francis W. Tully, a radio commentator and newspaper editor and publisher, and John J. Lindsay, a newspaper reporter, to the effect that in November 1952 following the trial in September, Sahagian said in substance that he had not intended to commit a crime. Sahagian testified under oath to a like effect at a hearing before an examiner of the Federal Alcohol Administration in April 1953. On cross-examination by the State, Mr. Tully testified:

> "Q. Now as I understand it, you now say that Mr. Sahagian said that in substance 'that when I testified at the Papalos trial I testified incorrectly because I did not and never had intended to commit a crime?'
> "A. Yes, sir.
>
> "Q. In any other respect did Mr. Sahagian attempt to retract any of the testimony that he had given at that trial?
> "A. No, sir."

Sahagian also testified for the respondent at the hearing on the motion. He said in part:

> "Q. So when you answered that question in saying 'I would not only pay graft but I would do anything to protect my business, protect my investment, and protect my lifetime savings' that you had no intent to break any law?

"A.   My interpretation of that was, the way I understood that, I am not breaking the law. I am breaking the law but yet I could not be punished for it because I was advised to do it.

"Q.   In other words, you take the position that the Chief of the Maine State Police told you to break the law and you couldn't be punished for it?
"A.   No, he did not tell me that I could go ahead and break the law. He told me to go ahead and get the evidence, and I had to get the evidence to the best of my ability."

The evidence noted above came into being after the trial. It is material to the issue. The most, however, that can be said is that Sahagian recanted on his testimony. The respondent would have it, to put his case most favorably, that he is entitled to a new trial because Sahagian since the trial has said that he had no criminal intent contrary to his testimony in the case at bar.

In *State* v. *Dodge,* 124 Me. 243, 127 A. 899 (1925) the court said, at page 249:

"The mere fact that an important witness comes forward and confesses himself a perjurer at the trial does not *ipso facto* warrant the court in granting a new trial. Recantation has frequently been declared by the courts to be the most unreliable form of evidence on which to base a new trial."

The issue of Sahagian's *intent* was thoroughly examined at the trial. The jury had the advantage not available to an appellate court of seeing and hearing Sahagian and the other witnesses. They were in a position from all of the evidence, not alone from what Sahagian said, to discover his true intentions. The evidence offered on the motion for new trial reflects, so it seems to us, the interests of Sahagian at the time he spoke with the reporters and testified before the federal examiner. The evidence on this issue

would not, in our opinion from an examination of the entire record, result in a different verdict if added to the material considered by the jury in reaching their verdict.

Mr. Lindsay also testified that he overheard a brief conversation during the trial between Sahagian and another State's witness. This amounted to no more, as we read the record, than a remark by Sahagian upon his success in meeting a skillful cross-examination. It did not bear upon the claim that Sahagian had given false testimony.

On the question of concealment of immunity, the evidence discloses that Mr. Bird, in urging Sahagian to disclose information, was of the opinion that Sahagian would be immune from prosecution under the statute, reading:

> **"Sec. 8.   Informer is exempted from punishment.**
> . . . Whoever, offending in the manner described in the 3 preceding sections (relating to bribery), gives information under oath against the other party so offending and duly prosecutes him shall be exempt from the disqualifications and punishments therein provided." R. S. c. 122, § 8 (1944).

Further, at the request of Mr. Bird, without however being informed of the individuals concerned, Mr. Niehoff gave his opinion to the like effect. Before Sahagian made any disclosures of the contract, the payments, or of the persons involved, Sahagian was informed of the opinions of Mr. Bird and Mr. Niehoff upon immunity and also sought and received the opinion of Charles N. Nawfel, his personal attorney, which was to the same effect. Armed with three opinions that he had an immunity from prosecution, Sahagian then proceeded to disclose the Papalos-Zahn matter to Mr. Bird. Later, it appears Mr. Niehoff was of the view that the immunity statute did not apply to a conspiracy to bribe. Mr. Bird and Mr. Nawfel did not alter their opinions. Counsel for the respondent were also of the opinion that the statute did not apply to a conspiracy. In discussing Sa-

hagian's position with the State, counsel for the respondent were advised that "no deal" had been made with Sahagian.

Sahagian, in testifying at the trial, believed he had gained immunity. There is, however, no evidence that anyone who acted for the State in the case, either before or during the trial, ever did more than say to Sagahian in substance that the statute governed. In brief, the immunity of Sahagian, which he believed he had, came not by way of the promise of the State, or anyone acting for the State, but from the statute.

The legal situation arising from the statute quoted was as well known to the respondent's counsel as to the State. Concealment by Sahagian or by the attorneys for the State cannot be based upon the fact that several persons interpreted the statute quite differently.

There is also a complaint that Sahagian was not permitted to explain an answer relating to his criminal intent. The record shows no more than that Mr. Nawfel requested the prosecution to put Sahagian on the stand again for this purpose. On denial of the request, neither Sahagian nor his attorney took any further action, such as communicating with the court, for example. There was nothing improper, in our view, in the conduct of the prosecution on this point. The motions are denied.

The entries will be:

> *Exceptions overruled.*
>
> *Motion for new trial denied.*
>
> *Appeal dismissed.*
>
> *Motions for a new trial on the ground of newly discovered evidence denied.*
>
> *Judgment for the State.*