STATE OF MAINE *vs.* JOHN J. O'DONNELL ET ALS.

Cumberland.    Opinion July 27, 1932.

*Herbert J. Welch*, for respondents.
*Walter M. Tapley, Jr.*, County Attorney, for the State.

SITTING : PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, JJ.

DUNN, J.    On Friday, September 18, 1931, at about eleven o'clock in the forenoon, three armed and masked persons, two of them wearing overalls, suddenly and unexpectedly entered the office

of the Cabot Manufacturing Company, in Brunswick. They ordered the paymaster to put up his hands, turn around, and look out a window. The other employees were made to hold up their hands, and face the wall. All were covered by revolvers. One of the intruders gathered the money (amounting to eight thousand, one hundred twenty-nine dollars and forty-six cents, from which the weekly pay-roll was being prepared) from a table, into a bag, and made away with it. The other stick-up men immediately followed, the last one backing out. Neither the paymaster, from whose possession the money was taken, nor any employee of his office, nor a clerk in an adjoining office, describes the appearance of the robbers, except in general respects. No one else connected with the company then knew of the deed. All these facts are about as morally certain as human evidence can establish things.

John J. O'Donnell, Gregory Griffin, Dennis Franco, George Loring and Phillip Williams, all of Portland, some of them of brief residence there, were suspected of the crime. They were jointly indicted. All except Loring, who apparently was not in custody, were tried together, before the Superior Court in Cumberland County, at the January Term, 1932. As to Franco, the jury verdict, by direction of the presiding justice, was not guilty. O'Donnell, Griffin and Williams were found guilty.

Exceptions were taken, during the trial, to the admission of certain evidence. On the part of Williams, exceptions included the admission (after preliminary proof, in the absence of the jury, of its voluntary character) of an alleged confession of his guilt. None of the exceptions were perfected. At the conclusion of the evidence, motions that verdicts of not guilty be ordered, were overruled. To the overruling of these motions, exceptions were noted.

After verdict, general motions for new trial were addressed to the presiding justice (as motions in criminal cases must necessarily be. *State v. Dodge*, 124 Me., 243, 127 A., 899). Filing the motions operated as a waiver of exceptions to the refusal to direct verdicts. *State v. Simpson*, 113 Me., 27, 92 A., 898; *State v. DiPietrantonio*, 119 Me., 18, 109 A., 186. The motions were overruled.

Separate appeals have brought the case to the Law Court. R. S., Chap. 146, Sec. 27. In each instance, the question is whether, in view of all the evidence, the decision from which the appeal was

taken is wrong. *State* v. *Lambert*, 97 Me., 51, 53 A., 879; *State* v. *Albanes*, 109 Me., 199, 83 A., 548; *State* v. *Priest*, 117 Me., 223, 103 A., 359; *State* v. *Dodge*, supra. That decision held that the jury was warranted in believing beyond a reasonable doubt, and therefore in declaring by their verdict, that the respondents were guilty of robbery.

Circumstances are woven into the texture of the case for the government. The admission of circumstantial evidence is too well established to need the citation of authority. When, considered as a whole, circumstantial evidence leads to a conclusion of guilt, with which no material fact is at variance, it is not, as a matter of law, inferior to direct evidence, and neither the court nor the jurors can conscientiously disregard it. 16 Corpus Juris, 763.

The case will be as clearly presented, perhaps, as in any other way, if it be now stated that there was evidence tending to prove that on Wednesday, two days before the robbery, an Essex automobile of the sedan type, painted green, belonging to a Portland physician, was stolen.

In the afternoon of that same day, it is shown that Williams and O'Donnell (of the respondents) came to Brunswick, in a car similar in description; that they stopped at the home of Sybil and Marguerite Peters, where permission was asked, and granted, to leave the car in the garage until the next night (Thursday). According to Marguerite Peters, the men remained there the greater part of the afternoon, returning again in the evening, when her sister Sybil was also at home. Later in the evening, Griffin (the third respondent) and a man unknown to the Peters girls, arrived in another automobile. The four — Williams, O'Donnell, Griffin and the stranger — left the Peters' house together, so both girls say. O'Donnell contradicts the statement about leaving the car, and says he never even knew of its being left there.

The testimony records no further incident until Friday morning. Then, between 10 and 10.30 o'clock, so Sybil Peters swears, O'Donnell came to her house, and drove the car away. This, too, is denied by O'Donnell.

Edward M. Brown, a deputy sheriff, testifies that on Friday morning, not far from eleven o'clock, while crossing the bridge leading from Brunswick to Topsham, he saw O'Donnell, sitting side-

wise, nearly facing the driver, in the front seat of a green sedan, which was coming into Brunswick. The deputy did not know the driver, nor the two men on the rear seat. He states he thought the car was an Essex, but it may be that his recognition was too slight to be of consequence. The evidence of this witness is valuable as affording room for the jury to find that O'Donnell was in Brunswick, or on the edge of Brunswick, on a day when his own testimony would show that he was not there, and at an hour approximating that of the commission of the crime, at which time he claims he was asleep in a Portland hotel.

A little after one o'clock Friday afternoon, Ezbra D. Brown, of Brunswick, found a green Essex sedan abandoned, in a wood lot back of his home. A dealer's license plates were on the car. In it were blue denim overalls; also a leather bag, which the witness called a Boston bag, containing a bottle of medicine, and a "lung tester, or some rubber affair."

Francis A. Forgione, the Portland physician whose automobile was stolen, attests confidently to his ownership of the car discovered in the woods. He well describes it, and, supplementing recollection from minute or record, gives its motor and serial numbers.

Around ten o'clock Saturday night (that of the day next after the robbery), Williams and Griffin appeared at the home of the latter's sister-in-law, in Hopedale, Massachusetts. A year or more had passed since Griffin had seen his marriage relative; he gave her one hundred dollars at this time, as a wedding present.

Where, for the next fortnight, Griffin and Williams were staying, and whether separately or together, is not more definite than intermittently in Massachusetts towns. Griffin was at his brother's (this sister-in-law's) in Hopedale, frequently. Williams came with him several times. A taxicab driver testifies that on the Saturday night of their first appearance, he drove them to a place called the Blackstone Inn, where they drank and gambled. They had, he gives evidence, "considerable money." They left, about five o'clock the next morning, in the cab in which they had come.

O'Donnell, on his version, went to Boston from Portland, on the Monday following the robbery, to see about an attached car; he says that he returned on Thursday. A few days later, the evidence shows he was in Hopedale, Massachusetts, looking for Griffin. He

found him at a show in Milford. Where O'Donnell, or, for that matter, Williams and Griffin were, from that time until October 2nd, is differently indicated. Apparently all three were in Massachusetts, crossing occasionally into Rhode Island; there is allusion to "running stuff" (liquors) out of Providence.

On Friday, October 2nd, Williams, Griffin and O'Donnell came to a lodging house in Milford, Massachusetts, looking for a room where the three might be together. No such room was available until Sunday. A large room was engaged for that time. Williams and Griffin then left; O'Donnell remained, engaging and paying for a smaller room to occupy for the intervening time. He registered as John Curran.

Williams and Griffin did not come back till Monday noon. They then paid for the large room one week in advance; O'Donnell moved in with them. They said they might remain all winter, and asked if more "boys" could be accommodated.

The next morning the landlady learned that two strange men had been admitted to her house during the night, occupying a room (vacant the evening before) next the large room. On being questioned as to the newcomers, Williams said it was so late when they came in (impliedly all together) that they did not want to ring the bell. The men then registered and paid. One of them was known as Leo; the other as Frisco.

A little before one o'clock that afternoon, the five left in a new Chrysler car, going in the direction of Blackstone. Williams, it appears, had bought the car in Rhode Island, a few days before, paying five hundred dollars for it. Griffin was with him at the time.

Up to Wednesday afternoon, none of the men had been back to the lodging house. That afternoon, as a result of something she read in a newspaper, the landlady notified the police; an officer came and searched the rooms the men had occupied. In the room of Williams, Griffin and O'Donnell, there was a locked suitcase, which the officer opened, removing three revolvers, two boxes of cartridges, and some loose cartridges.

Of the roomers, no one of the five was again at the house.

They had been arrested, early in the morning of that day, at the Blackstone Inn. They were taken to the police barracks at Wren-

tham, Massachusetts for an hour or so, and thence to headquarters at the State House in Boston.

The government insisted that Williams (who was also known to the Massachusetts authorities as Goldberg, or Goldenberg) there made the aforementioned confession. This confession, a piece of evidence by itself, relating only to himself, constitutes an important chapter in the case against him.

Confessions elicited by any expectation of favor or by menaces are not permissible in evidence, not because of having been extorted illegally, but because the party making them is supposed to be liable to be influenced, by the hope of advantage, or fear of injury, to state things which are not true. *Com.* v. *Knapp*, 9 Pick., 496; *State* v. *Soper*, 16 Me., 293, 298; *State* v. *Grover*, 96 Me., 363, 52 A., 757.

Upon admission of Williams' confession into the evidence, its probative force was for the jury, depending upon all the circumstances under which it had been obtained; the respondent had the right to ask the jury to give little heed to it, or to disregard it utterly, if they found it to have been improperly obtained. *State* v. *Grover*, supra; *State* v. *Priest*, supra.

There was testimony that the confession of Williams was obtained through beating and bruising him, and threatening him, while he was in the custody of the Massachusetts police. When he was brought before the Municipal Court in Brunswick, Maine, on the following day, he had bruises above his eye and forehead. Evidence in rebuttal, besides denying ill treatment and threats, suggests a different source of the infliction of the injuries. Through this evidence, the jury could have found that the contention of the defense had been negatived.

The gist of the confession follows:

Williams and four companions (O'Donnell, Griffin, Franco and Loring) left Portland for Brunswick, after nine o'clock on the morning of the robbery, in a Hudson automobile. They stopped at a private garage in which was a previously stolen Essex car. Three of the party (Williams being one) drove in this car to a side road, where they rejoined the others. Williams and Loring now changed to overalls. They, with O'Donnell and Griffin, drove in the Essex to

the yard of the Cabot mill; Franco was left in charge of the Hudson car.

On reaching the yard, Griffin, the driver of the Essex car, remained with it; Loring, Williams and O'Donnell entered the mill office, masking their faces with handkerchiefs. While the other two kept the office force within range, Williams took the money (some of it in envelopes, and some in loose bills), and put it into the cloth bag which he had with him; all three then departed.

They were driven in the Essex car to where the Hudson was waiting. They "made a shift"; then drove to a farm house, where they divided the money. Five hundred dollars was put aside for the owner of the Hudson car; one hundred and fifty dollars for the man who stole the Essex car; and two hundred and fifty dollars for some other purpose; the "split" was fourteen hundred dollars apiece. The group then separated. Williams, O'Donnell and Griffin went back to the Portland hotel where they had been staying.

The next day, Williams and Griffin went to Massachusetts, where, several days later, they were joined by O'Donnell. Williams did not see Franco after leaving Maine; apparently he did not see Loring. To continue further from the confession, the guns used in the robbery were taken by Loring, to whom they belonged.

If Williams is right regarding the guns, those in the suitcase in the lodging house might not have had connection with the robbery. This was for the jury to decide. And right here it may be stated that one of the revolvers found by the officers was positively identified as the property of a man in Brunswick, Maine, whose testimony is that the gun had been taken from his room without his permission. Evidence goes to show that a girl afterward gave it to Griffin. One of the other guns is said to have looked like that which one of the robbers laid for a moment on a table in the mill office. Quite naturally, there was then but slight opportunity for inspection. It may be added that both the Peters girls recognized this gun as resembling one which Williams had shown them, explaining he had it for protection in his business as a salesman.

It is important to notice and appreciate how little of the evidence which corroborates the confession of Williams could possibly have been anticipated by him.

Before leaving the aspect of the case immediately relative to Williams, let it be observed that Sybil Peters states Williams wrote her from the Portland jail to come to see him, which she did, accompanied by her sister. She says he advised them to leave town, and avoid being summoned to court. The sister's testimony is substantially the same. They were dismissed from the stand without cross-examination on the point.

This brings the case to where there may be consideration of evidence against O'Donnell, individually.

The government does not rely, in his instance, on a confession, but on his admission of independent facts, from which, when considered with other facts, it is insisted, his guilt was inferable. A confession is the voluntary acknowledgment of the criminal act charged, or of participation in its commission. Incriminating admissions may be made without any intention of confession.

One Ralph Frisco (who should not be confused with the respondent Dennis Franco) was arrested when O'Donnell was. Frisco is testified to have said, in the presence and hearing of O'Donnell, that he came from Portland to Massachusetts, in company with one Dominick Leo, in response to O'Donnell's telegram. Lieut. Ferrari (the Massachusetts police detective to whom the confession of Williams was testified to have been made) quotes Frisco as saying that in reply to O'Donnell's inquiry as to what was doing down in Portland, he had told him they were looking for him (O'Donnell) down there; and that in the course of their conversation O'Donnell said his "split" was fourteen hundred dollars. O'Donnell having admitted that he heard what Frisco had said, the lieutenant asked him, "What do you say about that?" O'Donnell replied, according to the witness, "Well, if he said so, it must be so."

Neither Frisco nor Leo, though both were arrested, were indicted. Nothing identifies them with the robbery.

As to Griffin, the evidence for the government is not so strong as in the case against Williams (nor in that against O'Donnell, whose defense is stated later), but there is sufficient to sustain the verdict. Griffin, there was testimony, came to the Peters' home on the evening of the storing of the automobile, and took the other respondents away in his car. He left Maine with Williams, and went with him to Massachusetts, immediately after the robbery. His manner

of living, and the way he spent his time, in that State; the belated gift to his sister-in-law; and his free spending of money, were circumstances for the jury to weigh, and from which it might draw reasonable inferences. Testifying in his own behalf, Griffin said that his business, that of a "booze runner," brought him to Massachusetts; that, when working, his earnings approximated one hundred dollars weekly. On the conflicting evidence, the question of his guilt was for the jury.

The conclusion of the jury is not disturbable.

The defense made a great effort to break the force of the evidence against Williams and O'Donnell.

Williams did not testify before the jury. That he did not, presented no evidence of his guilt. R. S., Chap. 146, Sec. 19. Griffin, testifying in behalf of Williams, says he first knew him in 1920, in Massachusetts. In 1931 Williams came to Portland, where he booked crap games, was in the liquor business, and also was a salesman for women's clothing.

Griffin asserts that he was not with Williams in Brunswick during the daytime of the Friday of the robbery, but in Portland, drinking and hanging around. He says that he and Williams were in Brunswick late that night. A State police officer testifies that he saw Griffin (who was intoxicated), with Williams, in an automobile, on that night, between 11.30 and 12 o'clock, going towards Brunswick, Williams driving. The officer states that he searched the car but found nothing. This testimony for the defense did not preclude belief in Williams' own statement that he was in Brunswick during the forenoon.

John J. O'Donnell, the remaining respondent, gave his age as twenty years. He said his people lived in Portland; that for a short time he had not been at home, but at the Royal Hotel in that city. His business, he stated, was slot-machines and booze. His story was that he and Williams were together in Brunswick, late at night, on September 16th, or September 17th (the robbery was on the morning of the 18th), "booze running." He admits that they were at the Peters girls' house, and adds they went from there to their hotel in Portland. He testifies that on Friday (that of the robbery) he was at this hotel, sleeping, until two o'clock in the afternoon; then got

up, and spent the afternoon about the streets; and the evening at a theater with a friend.

He manifests, without assigning any especial reason, a memory of events not naturally associated with that particular day.

He says that after Friday he was at home, his "folks" having asked him to come back; that he remained there until Monday, when he left for Boston to see about his attached car.

The fact that his friend was not called to corroborate him about the theater, nor his people about his being at home, nor the failure to call any of them explained, might, in the estimation of the jury, have thrown doubt upon the value of his statements, or even reduced their reliability to zero. He denied sending a telegram to Frisco and Leo; and said (this, too, at variance with testimony for the State) that Boston police attacked him, and that a Portland officer threatened him. His contradiction of the Peters girls regarding the car, and of the deputy sheriff.about being on the bridge, have already been mentioned.

The jury convicted the respondents.

The Court is of the opinion that they were proven guilty, in accordance with the law, upon sufficient evidence. Their respective appeals are dismissed, and their motions for new trial denied. As to John J. O'Donnell, Phillip Williams and Gregory Griffin, judgment goes for the State.

*Appeals dismissed.*
*Motions denied.*
*Judgment for State.*