HALL v. STATE.

4393                                    189 S. W. 2d 917

Opinion delivered October 22, 1945.

Rehearing denied November 19, 1945.

*M. V. Moody,* for appellant.

*Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

McHANEY, J.   Appellant was, on March 26, 1945, charged by information with the crime of murder in the first degree for the killing, on September 14, 1944, of his wife, Fayrene Clemmons Hall, "by some means, instruments and weapons to the prosecuting attorney unknown." Trial was begun on May 7, 1945, after a plea by appellant of not guilty and also a plea of not guilty by reason of insanity. Prior thereto, on March 29, 1945, on his petition filed on said date, he was committed to the State Hospital for Nervous Diseases for observation and investigation of his mental condition, and to make a written report thereof within 30 days. On May 9, after an exhaustive trial, he was by the jury found guilty of murder in the first degree as charged in the information and he was by the court, on May 14, sentenced to death by electrocution. Thereafter, in apt time, an appeal was prayed, and was granted by the Chief Justice to this court.

For a reversal of the judgment and sentence against him appellant makes four contentions: 1, that the con-

fessions made by him were not admissible against him; 2, that he is insane; 3, that the *corpus delicti* was not established; and 4, that Dr. Kolb, superintendent of the State Hospital for Nervous Diseases, was permitted to testify, over his objections, to a confession made by him when his sanity was being inquired into.

Before discussing these assignments of error, we think it may be helpful to recite the facts or some of them in the light most favorable to the State, most of which are undisputed. Appellant did not testify in the case, except in chambers and out of the presence and hearing of the jury, and then only in connection with the admissibility of his confession. A number of witnesses, including some physicians, testified in his behalf in relation to his sanity.

Fayrene Clemmons Hall, wife of appellant, disappeared Thursday night, September 14, 1944. She attended a dance at Rainbow Garden on that night with appellant and Mrs. Clyde Green. They all left the dance at midnight and appellant and his wife had a quarrel. She said she was going to leave him. They took Mrs. Green home in a car, and left her there. Fayrene has never been seen or heard from by any witness in the case since that night. Mrs. Green knew the kind of dress Fayrene had on that night—a red dress with peculiar buttons on it, of a kind she had never seen before, "with little chains with a thing on the end that looks like a nail and that fastens in that manner" (indicating). She identified the remains of a dress found at the scene of the alleged crime by its color and the buttons. A number of other witnesses, including her father and mother and a number of close friends, testified to her disappearance on or about the same time, none of whom have ever seen or heard from her since her disappearance.

Appellant was arrested in Little Rock on March 15, 1945, locked up, and, on the following night, was taken to the state police headquarters, where he was questioned. Without any threats, coercion, abuse on the part of those present, which included city police, state police, newspaper reporters and possibly others, and without any

promise of leniency or hope of reward being offered, he confessed to the killing of his wife. Detective Harold Judd of the city police testified as follows: "Q. What did he say, Mr. Judd, with reference to what happened to his wife? A. He started off by telling about being at the Rainbow Garden on a night in September, he didn't know what date it was, to a dance. After he left there, he took a girl home by the name of Katy Bryant. He went out the river road by Pulaski Station down close to the river, and that is where he killed her and left her body. Q. Did he say he killed her there? A. He did. Q. Did he say he left her body there? A. Yes, sir. Q. What did he say with reference to taking you where the body was? A. He said he would take us the next day. He didn't think he could find it that night because he never had been down there before. Q. Did he say how he killed her? A. He said he killed her with his hands. Q. Mr. Judd, later on did he take you where the remains were? A. He did. Q. Did he point out the place where he killed her and left the body? A. Where to stop the car, and he got out and walked down to where he left the body? Q. There's where it was found? A. Yes, sir. Q. These exhibits introduced in evidence, the shoes, hair, jawbone, dress and other bones were found there? A. Yes, sir. Q. Up to the time he told you where he killed her and left her, did you have any idea of where the remains were? A. We didn't until he took us and showed us."

The Katy Bryant referred to by Judd is the maiden name of Mrs. Clyde Green who testified as above noted.

Several other police officers, both city and state, and a reporter for the Gazette, who was present, testified to substantially the same facts with reference to appellant's confession, regarding its free and voluntary nature, the killing of his wife, the place of concealment of the body, his directing them to the scene of the crime next day, and the finding of the remains at or near the place pointed out by him—a human skull which had previously been found at the scene by Cecil Foster who lives nearby on the farm on which the crime was committed and who brought it to the officers when he saw them there search-

ing for something and who pointed out the hole in the ground where he found it; also a human jawbone, a pair of ladies shoes, wisps of human hair, pieces of a red dress with buttons of the kind described by the witness, Mrs. Clyde Green, and some other human bones.

The jawbone found had a tooth overlapping another and appellant stated to Agnes Watson, a reporter for the Arkansas Democrat, and others, that he knew the jawbone was that of his wife because of the overlapping tooth. Several witnesses, including the father and mother of deceased, identified the jawbone in like manner, also the dress and shoes as being hers and the hair as being the color of hers.

Considering now the assignments of error argued for a reversal, it is first said that the confession was inadmissible under the authority of *McNabb* v. *United States,* 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819. That case was distinguished in *State* v. *Browning,* 206 Ark. 791, 178 S. W. 2d 77, and what was there said need not be repeated here. Counsel for appellant conceded in oral argument that, if we adhere to the case of *State* v. *Browning,* the confession here was properly admitted in evidence, and we do adhere to and expressly reaffirm the holding there made.

Secondly, it is argued that appellant is insane and that he should have been acquitted by reason of his insanity. There was ample testimony to support the jury's finding that he was and is sane. The court submitted this question to the jury under correct and proper instructions, first that he was presumed to be sane and the burden was upon him to prove by a preponderance of the evidence that, at the móment the act was committed, he was insane as defined in another instruction. This is a correct declaration of the law as we have held in many cases. *Kelly* v. *State,* 154 Ark. 246, 242 S. W. 572, and cases there cited. In another instruction the court told the jury that the defense of insanity "cannot avail unless it appears from a preponderance of the evidence that at the time of the act the defendant was under such a defect of reason from disease of the mind: First, as not to know

the nature and quality of the act he was doing; or second, if he knew it, that he was doing wrong; or third, if he knew the nature and quality of the act and knew it was wrong he was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done and unable, because of the disease to resist the doing of the wrong act, which was the result solely of his mental disease." This instruction is a copy of one approved by this court in *Bell* v. *State*, 120 Ark. 530, 180 S. W. 186, and found on p. 553, where it was said by Judge Wood for the court: "These tests are in accord with the great weight of modern authority."

Dr. Kolb testified positively that he was sane, knew right from wrong, and can refrain from doing wrong if he so desires. His testimony and report to the court reveal an exhaustive and painstaking examination of appellant, which was made at his request through his counsel and under the order of the court by authority of Initiated Act No. 3, found in the Acts of 1937, p. 1384. A number of physicians and lay witnesses testified in his behalf which tended to show that he had a psychopathic personality or that there was insanity in his family and that he acted strangely at times, but after all it was a question for the jury, and by its verdict he was found to be sane, and being supported by substantial evidence it must be permitted to stand.

Next it is argued that the state failed to prove the *corpus delicti,* which in this case involves, first, proof of the death of Fayrene Clemmons Hall; and second, that her death was caused by the criminal agency of some one. In *Edmonds* v. *State*, 34 Ark. 720, on p. 744, Chief Justice English quoted from Burill on Circumstantial Evidence with approval the following: "In cases of alleged homicide, the proof of a *corpus delicti* involves the following points or general facts: First, the fact of death, particularly as shown by the discovery of the body, or its remains; secondly, the identification of such body, or remains, as those of the person charged to have been killed; and, thirdly, the criminal agency of another, as the cause of death."

The fact of Fayrene's death and the identification of the remains found as hers appear to us to have been abundantly established. In addition to instructions on circumstantial evidence, the court gave, at appellant's request, instruction No. 4, as follows: "The court charges you that the mere fact that the skeleton and remains of a dead woman were found raises no presumption that such woman was murdered by the defendant, nor does it raise any presumption that she was murdered at all by anyone. Before you can convict the defendant, you must be convinced beyond a reasonable doubt, first, that the remains found and testified about are the remains of Fayrene Clemmons Hall; second, that she was in fact murdered; third, that it was done by defendant. If you are not convinced beyond a reasonable doubt that all three of these elements exist, it will be your duty to return a verdict of 'not guilty.' " It is undisputed that Fayrene disappeared on the night of September 14, 1944, after a quarrel with her husband and has not been seen or heard from since; that she was wearing a red dress with unusual buttons; that she took nothing with her when she left except what she was wearing; that she was young and in good health; that appellant told her neighbors, close friends and parents different and conflicting stories regarding her disappearance; that he made no report to the police regarding her disappearance, but such a report was made by her half-sister and her mother; that, after appellant was arrested, he confessed and that he had killed her with his hands on the bank of the Arkansas River and led the officers and reporters to the scene of the crime where all the remains above detailed were found and identified as the remains of Fayrene Clemmons Hall. The third element of the *corpus delicti* is, did appellant kill his wife, Fayrene? He answers that question himself by his confession, which, not being made in open court, is what is called an extrajudicial confession.

Our statute, § 4018 of Pope's Digest, provides: "A confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied with other proof that such offense was committed." In *Bell and Swain* v. *State*, 177 Ark. 1034, 9 S. W. 2d 238, the late

Chief Justice HART, speaking for the court, said: ''This court has uniformly held that, under our statute, to warrant a conviction from an extrajudicial confession of the accused, there must be independent evidence to establish that the crime has been actually perpetrated by some one.'' Citing cases. It was there held that, outside of the confessions of Bell and Swain, which were not made in open court, there was no evidence sufficient to show that McCollum and Thomas were drowned by anyone.

Here, however, the evidence is not only ample, but conclusive to show that Fayrene Clemmons Hall was murdered by some one, which meets the requirements of said statute regarding extrajudicial confessions. Therefore, the confession, accompanied as it is by other proof that such offense was committed, satisfied the rule by which the *corpus delicti* may be established, and justified the jury's verdict. As said in *Edmonds* v. *State, supra,* ''there was some proof of the *corpus delicti,* and its weight and sufficiency were properly left to the jury.''

It is finally argued that it was error to permit Dr. Kolb to testify, over his objections, that appellant confessed to him that he killed his wife. As we understand the contention, it is not based on the existence of the relation of physician and patient, and within the provisions of § 5159 of Pope's Digest, but that he was sent to the state hospital to be examined and his mental condition determined under the provisions of §§ 11 and 12 of said Initiated Act 3, and not to obtain a confession or other statement against his interest from him, and then to so testify in court. Said act provides in § 11 that the judge shall in certain cases order the superintendent to direct some competent physician employed by the state hospital ''to conduct observations and investigations of the mental condition of the defendant, and to prepare a written report thereof.'' This was done by Dr. Kolb. By § 12, the physician who prepared the report shall be called to testify by either party and may be examined by either party. The act does not prohibit the use of a confession, if one is obtained by the physician, and we see no valid objection to its use in this case, for in the

first place, it is merely cumulative to his confession to many others; and in the second place, the doctor asked him if he killed his wife, which he admitted, for the purpose of asking him the further question, whether he had any remorse of conscience for having killed her. These and many other questions and answers, stenographic report of which was made at the time, were asked for the purpose of determining his sanity.

In *Burris* v. *State,* 168 Ark. 1145, 273 S. W. 19, two physicians who had practiced for Burris and his family were permitted to testify as to his sanity for the State on his trial on a charge of murder. Their opinions were based on mere observation of Burris during their attendance as family physician and by observing him on the witness stand, but not from information received for the purpose of treating him, and this court held their testimony competent and not privileged as being within said § 5159 of the Digest. This is the general rule. 70 C. J., p. 440; 28 R. C. L., p. 539. While it is true under the provisions of said Act 3, the primary object is to determine the sanity of the person so committed and a report to the court of the findings of the physician in this respect, (and that is all the report showed in this case) still, it is further provided in § 12 that the physician making the report may be called to testify by the court or either party and examined in open court, and the act does not limit the scope of the inquiry so as to exclude voluntary statements made by the person examined to the physician.

We conclude, therefore, that no error was committed on the assignments argued, or any others in the record, and that appellant has received the benefit of all the provisions of law. The trial court fully protected all his rights by instructions on presumption of innocence, burden of proof, reasonable doubt, insanity and circumstantial evidence. He was found guilty by a jury of his peers and the form of the verdict required the court to sentence him to death for the heinous crime he committed, and the judgment must be and is affirmed.