### STATE OF MAINE
### *vs.*
### CLYDE MAYNARD HATHAWAY, JR.

Franklin.    June 25, 1965.

*Phillip M. Kilmister* and *Jerome S. Matus,*
  Assistant Attorneys General, for the Plaintiff.

*John A. Platz* and *Thomas E. Day, Esqs.,*
  for the Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, MARDEN, JJ. RUDMAN, J. did not sit.

SULLIVAN, J. Respondent a boy 12 years of age was indicted for murder. He pleaded not guilty, not guilty by reason of insanity and not guilty by reason of mental disease or mental defect. He was tried by a jury and was found guilty. During trial respondent noted and reserved 12 exceptions. Respondent after verdict seasonably moved for a new trial and has appealed from the Court's denial of such motion. Respondent here prosecutes his exceptions and appeal.

In his motion respondent *inter alia* protested that the instructions of the trial Court to the jury were erroneous as a matter of law.

Some of the presiding Justice's jury instructions were as follows:

> "What is the rule if the Respondent says 'I am not guilty by reason of insanity,' or 'I am not guilty by reason of mental disease or mental defect?' The burden is then upon the Respondent to prove these allegations or contentions by a fair preponderance of the evidence. You will there note there is a distinction. The State must prove the necessary elements, which are required by law for the State to prove, by a degree beyond a reasonable doubt. In the affirmative defense—and a plea of

not guilty by reason of insanity, and so forth, would be termed an affirmative defense—there the burden is upon the Respondent, not to prove it beyond a reasonable doubt, but by a fair preponderance of the evidence."

\* \* \* \* \* \* \* \* \* \* \*

"To establish the proposition that he was insane, or was suffering from some mental disease or mental defect, in the legal sense in this State, and, therefore, not criminally responsible at the time of the commission of the act, this Respondent must, as I have previously indicated to you, establish by a fair preponderance of the evidence that he was afflicted with mental disease or mental defect of such character that he would not have at the time of the commission of the act the mental capacity to distinguish between right and wrong as to that particular act, and that he had no knowledge or consciousness enough to know that the act was wrong and criminal. Then he has established that he was either insane or suffering from a mental disease or mental defect, and not otherwise.

"On the other hand, whatever the character or extent of the mental disease, if any he had, if at the time of the doing of the act he had sufficient mental capacity to understand the situation, and know the nature and quality of his act, that it was unlawful, that it was morally wrong, then he was not legally insane or legally suffering from any mental disease or mental defect. In other words, he must show by a fair preponderance of the evidence the existence of some mental disease or mental defect at the time of the act, and also that the disease was of such character or extent that it deprived him at that time, for the time being at least, of the mental capacity to understand the nature or quality of the act he was doing, its character and consequences or, in other words, the mental capacity to distinguish between right and wrong and to know that the act was wrong. He must not only show that he could not in some respect be

able to know the difference between right and wrong, but show a connection between the mental disease, if any there was—and that is for you to say—and the acts in question, that those acts flow from the mental disease that existed, and that the act was the product of a diseased or defective mind. If he establishes the mental disease, and its extent to the point I have described, then he was insane in the legal sense, and the act he did —if you find he did the act—is the unfortunate result of disease. Otherwise, the act must be held to be the result of a vicious disposition for which he is legally responsible.

"For your further enlightenment, I will read a recent statute enacted by our Legislature, which reads as follows: 'An accused is not criminally responsible if his unlawful act was the product of a mental disease or mental defect.' The terms 'mental disease' and 'mental defect' do not include an abnormality manifested only by repeated criminal conduct or by excessive use of drugs or alcohol.

\* \* \* \* \* \* \* \* \* \* \*

The statute so quoted by the presiding Justice is R. S. 1954, c. 149, § 17-B (P. L. 1963, c. 311, § 3) (15 M. R. S. A., § 102) and reads as follows:

"An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.

"The terms 'mental disease' or 'mental defect' do not include an abnormality manifested only by repeated criminal conduct or excessive use of drugs or alcohol."

This statute by its first sentence adopts the *"Durham Rule,"* so-called, the *"disease-defect-product test."* The second sentence adds a stated modification to the *"Rule."*

The *Durham Rule* is not statutory but was enunciated as a court decision in *Durham* v. *U. S.,* 214 F. (2nd) 862, 874, 875 (D. C. Cir., 1954), as follows:

"The rule we now hold must be applied on the re-trial of this case and in future cases is not unlike that followed by the New Hampshire court in 1870. It is simply that an accused is not crim-inally responsible if his unlawful act was the prod-uct of mental disease or mental defect." See *State* v. *Pike,* 49, N. H. 399 (1870).

Previous to 1961 (P. L. 1961, c. 310) this jurisdiction was said to observe the *"M'Naghten Rule."* In *M'Naghten's Case,* House of Lords, 1843, 10 Clark & Finnelly's Reports, 200, 210, it was said in part by the judges in response to theoretical questions:

"- - - - to establish a defense on the ground of in-sanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong - - - -"

In *State* v. *Lawrence,* 1870, 57 Me. 574, 576, this Court assented to a "right-wrong test" by acquiescing upon ap-peal with the subjoined instruction given in the trial court:

"To excuse a man from responsibility on the ground of insanity, it must appear, that at the time of doing the act he had not capacity and reason suf-ficient to enable him to distinguish between right and wrong, as to the particular act he was doing. That he had not knowledge, consciousness, or conscience enough to know, that the act he was do-ing is a wrong act, and a criminal act, and one that he will be subject or liable to punishment for do-ing - - - - In other words, a man may be a mono-maniac, his mind may be disordered, and, to a certain extent, it may be proved that he is of un-sound mind, and yet, if he has mind and under-standing enough, and is not carried away so but that he understands the difference between right and wrong, as to the act he is doing,—that is to

say, if the man knew that what he was doing is wrong, and he was liable to be punished for it, and that the act would not be excused, then he is subject to punishment, although there might be some partial derangement."

See, *State* v. *Knight,* 95 Me. 467.

Our modified *Durham Rule* statute was enacted by P. L. 1961, c. 310 as R. S. 1954, c. 149, § 38-A. It was repealed by P. L. 1963, c. 311, § 2 and reenacted by P. L. 1963, c. 311, § 3 as R. S. 1954, c. 149, § 17-B.

In *State* v. *Park,* 1963, 159 Me. 328, 334, 193 A. (2nd) 1 this Court said:

"The line between criminal responsibility and lack of responsibility is drawn by our 1961 statutes. We then discarded the McNaghten Rule and adopted the Durham Rule with modifications."

The *M'Naghten Rule* had long become a subject of controversy when in 1954 the *Durham Rule* was formulated judicially by the District of Columbia Circuit Court as the test of criminal responsibility.

"- - - - The science of psychiatry now recognizes that a man is an integrated personality and that reason, which is only one element in that personality, is not the sole determinant of his conduct. The right-wrong test, which considers knowledge or reason alone, is therefore an inadequate guide to mental responsibility for criminal behavior. As Professor Sheldon Glueck of the Harvard Law School points out in discussing the right-wrong tests, which he calls the knowledge tests:

'It is evident that the knowledge tests unscientifically abstract out of the mental make-up but one phase or element of mental life, the cognitive, which, in this era of dynamic psychology, is beginning to be regarded as not the most important factor in conduct and its disorders. In brief, these tests proceed upon the following questionable assumptions of an outworn era in psychiatry;

(1) that lack of knowledge of the 'nature or quality' of an act (assuming the meaning of such terms to be clear), or incapacity to know right from wrong, is the sole or even the most important symptom of mental disorder; (2) that such knowledge is the sole instigator and guide of conduct, or at least the most important element therein, and consequently should be the sole criterion of responsibility when insanity is involved; and (3) that the capacity of knowing right from wrong can be completely intact and functioning perfectly even though a defendant is otherwise demonstrably of disordered mind.' "
*Durham* v. *U. S., supra,* @ 871.

The *Durham* case did not completely abandon the right-wrong factor.

"- - - - The jury's range of inquiry will not be limited to, but may include, for example, whether an accused, who suffered from a mental disorder or defect did not know the difference between right and wrong, - - - -"
*Durham* v. *U. S., supra,* @ 876.

The *Durham* decision affirms the legal tradition of free will and individual responsibility:

"The legal and moral traditions of the western world require that those who, of their own free will and with evil intent (sometimes called *mens rea*), commit acts which violate the law, shall be criminally responsible for those acts. Our traditions also require that where such acts stem from and are the product of a mental disease or defect as those terms are used herein, moral blame shall not attach, and hence there will not be criminal responsibility - - - -"
*Durham* v. *U. S., supra,* @ 876.

This Court is here construing and interpreting an act of the Legislature. In *Durham* the Court was by inherent judicial authority formulating a test. (*Durham* v. *U. S., supra.* § 874.)

On October 8, 1962 the Circuit Court for the District of Columbia rendered its decision of *McDonald* v. *U. S.*, 312 F. (2nd) 847, reexamining and implementing the *Durham Rule*:

> "Our eight-year experience under *Durham* suggests a *judicial* definition, however, broad and general of what is included in the terms 'disease' and 'defect'. In *Durham,* rather than define either term, we simply sought to distinguish disease from defect. Our purpose now is to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. What psychiatrists may consider a 'mental disease or defect' for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility. Consequently, for that purpose the jury should be told that a mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional process and substantially impairs behavior controls. Thus the jury would consider testimony concerning the development, adaptation and function of these processes and controls.

> "We emphasize that, since the question of whether the defendant has a disease or defect is ultimately for the triers of fact, obviously its resolution cannot be controlled by expert opinion. The jury must determine for itself, from all the testimony, lay and expert, whether the nature and degree of the disability are sufficient to establish a mental disease or defect as we have now defined those terms. What we have said, however, should in no way be construed to limit the latitude of expert testimony - - - - -

> "- - - - We think the jury may be instructed, provided there is testimony on the point, that capacity, or lack thereof, to distinguish right from wrong and ability to refrain from doing a wrong or unlawful act may be considered in determining

whether there is a relationship between the mental disease and the act charged. It should be remembered, however, that these considerations are not to be regarded in themselves as independently controlling or alternative tests of mental responsibility in this Circuit. They are factors which a jury may take into account in deciding whether the act charged was a product of mental disease or mental defect. - - - - -"

*McDonald* v. *U. S.*, (1962), 312 F. (2nd) 847, 850, 851.

It must be noted that R. S. 1954, c. 149, § 17-B, 15 M. R. S. A., § 102 contains this modification of the *Durham Rule*:

"The terms 'mental disease' or 'mental defect' do not include an abnormality manifested only by repeated criminal conduct or excessive use of drugs or alcohol."

In this jurisdiction a defendant pleading not guilty to crime by reason of insanity has the burden of satisfying the jury by a preponderance of the evidence of the truth of such affirmative defense.

*State* v. *Lawrence*, 57 Me. @ 583.

In the case at bar the presiding Justice instructed the jury that it was incumbent upon the defendant to prove by a preponderance of evidence - - -

"- - - - that he was afflicted with mental disease or mental defect of such character that he would not have at the time of the commission of the act the mental capacity to distinguish between right and wrong as to that particular act, and that he had no knowledge or consciousness enough to know that the act was wrong and criminal - - - -"

The Justice continued:

"Then he has established that he was either insane or suffering from a mental disease or mental defect, and not otherwise."

"- - - - whatever the character or extent of the mental disease, if any he had, if at the time of the doing of the act he had sufficient mental capacity to understand the situation, and know the nature and quality of his act, that it was unlawful, that it was morally wrong, then he was not legally insane or legally suffering from any mental disease or mental defect.

"- - - - he must show by a fair preponderance of the evidence the existence of some mental disease or mental defect at the time of the act, and also that the disease was of such character or extent that it deprived him at that time, for the time being at least, of the mental capacity to understand the nature or quality of the act he was doing, its character and consequences or, in other words, the mental capacity to distinguish between right and wrong and to know that the act was wrong. He must not only show that he could not in some respect be able to know the difference between right and wrong, but show a connection between the mental disease, if any there was—and that is for you to say—and the acts in question, that those acts flow from the mental disease that existed, and that the act was the product of a diseased or defective mind. If he establishes the mental disease, and its extent to the point I have described, then he was insane in the legal sense, and the act he did—if you find he did the act—is the unfortunate result of disease. Otherwise, the act must be held to be the result of a vicious disposition for which he is legally responsible."

The foregoing instructions made it incumbent upon the defendant to prove preponderantly that he could not at the time of the imputed crime distinguish between right and wrong and that his alleged malefaction was the product of such disease or defect. Such instructions constituted a reversion to the restrictive and superseded *M'Naghten Rule* of *State* v. *Lawrence,* 57 Me. @ 576. The instructions rendered deprived the defendant of jury consideration and

estimation of the medical testimony presented upon the grave issue of defendant's inability because of some mental disease or defect to refrain from the imputed homicide irrespective of defendant's knowledge of right and wrong at the time of the tragic incident. The charge was therefore elliptical and insufficient. The jury were not informed that they could and must decide whether upon all the evidence the defendant had proved by a preponderance that at the occurrence of the fatal event the defendant's mental or emotional processes were substantially affected and his behavior controls were substantially impaired. There was prejudicial error. Defendant's appeal must be sustained and a new trial must be granted to him.

No exceptions to the judicial instructions were noted or reserved. Nevertheless this Court where injustice must otherwise inevitably result will sustain an appeal because of an erroneous charge although no exception was taken.

*State* v. *Papalos,* 150 Me. 370, 390, 113 A (2nd) 624
*Thompson* v. *Franckus,* 150 Me. 196, 203

The mandate shall be:

*Appeal sustained,*
*New trial granted.*

SULLIVAN, J.
TAPLEY, J.

Upon his arraignment the defendant pleaded not guilty, not guilty by reason of insanity and not guilty by reason of mental defect or mental disease. Defendant's attorneys petitioned the presiding Justice in accordance with the provisions of R. S., 1954, c. 149, § 17-A, (15 M. R. S. A. § 101), to commit the defendant to the custody of the Commissioner of Mental Health and Corrections, to be placed in an appropriate institution for the mentally ill or mentally re-

tarded, to be there detained and observed by the superintendent or his delegate and the professional staff until further order of court, for the purpose of ascertaining the condition of the defendant. That petition was granted and the defendant was resultantly placed in the State Hospital in the maximum security area for the period from October 23, 1963 to February 19th, 1964 and was observed by the professional staff.

At defendant's jury trial and over the objections of his counsel a psychiatrist of the hospital staff was permitted to recite to the jury in evidence quite complete admissions of the defendant's commission of the alleged homicide, made to the witnessing doctor and the hospital staff by the defendant. Such testimony had been offered by the State as the product of conversations between the defendant and the psychiatrist and as a necessary basis for the psychiatric findings of the testifying doctor in his judgment of the defendant's knowledge of right and of wrong at the time of the imputed homicide. The defendant excepted to the reception in evidence of the doctor's recital of defendant's admissions and assigned the following reasons:

> "- - - - That the admissions allowed by the Court were made by the Respondent when he was in police custody and not free to communicate privately with his parents or counsel; that the Respondent was neither seasonably nor properly advised of his constitutional rights, nor did he understand them nor appreciate the manner in which to exercise such rights; that the Respondent was not provided with the benefit of counsel; that the Respondent was denied the due process of law; that the Respondent at the time of the admissions by him alleged to have been made was legally presumed incapable of committing the crime with which he was charged."

At the making of the controversial admissions the defendant was not in police custody but by order of court

and by the obedient order of the Commissioner of Mental Health and Corrections the defendant was at the State Hospital under detention and observation by the Superintendent and the professional staff of that institution pending further order of court. The rationale of the observation was that of scientific impartiality.

Upon the record the defendant's parents visited him at the Hospital and there is no evidence that the defendant was not free to communicate with his counsel or parents. Defendant's counsel had presented to the trial court the petition for defendant's hospital custody and observation. There is no evidence that such counsel voiced any reservation of rights for the defendant or made any unrequited requests to visit or to attend him. Before any interviewing of the defendant he had been admonished at least 3 times of his constitutional rights to counsel, of his privilege against self-incrimination and of the foreseeable exercise against him of his answers. 2 such admonitions had been given by the prosecuting attorney; 1 had been imparted by the testifying doctor. In the judgment of that doctor a qualified psychiatrist the defendant had understood the instruction as to his rights and immunities. The defendant was a lad of some 13 years of age. The witnessing doctor saw the defendant several times weekly throughout a period of some 4 months. The doctor told the defendant why the latter was at the hospital. The defendant was confined but interviews with him were conducted in a calm manner and atmosphere. Inquiry and questioning as to alleged homicide were required for a professional opinion and report to the court. The boy was described by the doctor as bored by a long confinement and as being desirous of being alone. The witness stated that the defendant possessed "the mentality of a normal 12-year old" - - - - "knew the things that the average 12-year old knows" - - - "On the children's test he got a full scale I. Q. of 77 according to them. We got a 93 on ours."

The psychiatrist testified:

> "I told him that he had been sent to us by orders of the Superior Court for examination, and that nothing that passed between us was confidential, that it could be used either for or against him in Court. And I said 'Do you understand this?' He said 'Yes.' "

\* \* \* \* \* \* \* \* \* \* \*

> "Q. And it was based upon the fact that he said 'Yes' that you concluded he understood them, isn't that right?
>
> "A. Yes.
>
> "Q. And that was the only basis?
> "A. No."

\* \* \* \* \* \* \* \* \* \* \*

> "As we went on he indicated that he understood this because he told me that he had not answered some questions previously because his lawyer had told him not to. So, he understood exactly the position we were in. There was no question in his mind or mine that he understood he was there for observation."

This defendant was not an indigent respondent but upon the record was served by 3 competent counsel provided from his own or parental resources.

The statute in conformity with which the defendant was committed and observed at the State Hospital, R. S. 1954, c. 149, § 17-A (15 M. R. S. A. § 101), is not unconstitutional as violative of the inhibitions against self incrimination and due process. 32 A L R (2nd) 430, 444, 450.

At the time of the alleged and imputed crime the defendant was 12 years of age.

> "- - - - An infant - - - - cannot commit a crime under seven; is presumed, *prima facie*, not to be capable of crime under fourteen, though he may be; - - -"
> *Knight* v. *Fairfield*, 70 Me. 500, 501.

Whether this defendant at the time of the homicide referred to in this indictment was capable of criminal commission was one of the subjects of inquiry at the State Hospital observation.

Defendant had no obligation to answer the doctor's questions concerning any participation by the defendant in any crime. Defendant enjoyed an immunity from so doing. The defendant could have remained mute. He had been so advised by a lawyer, by the County Attorney and by the doctor. He had been warned of the possibility of his answers, if any, being used against him. At the State Hospital there is no proof of the exercise upon the defendant of abuse, guile, intimidation, compulsion, "brain washing" or extortion. Defendant through his twofold counsel and with the sanction of the court had sought medical findings and conclusions as to his mentality and the expert who functioned in observing the defendant testified that interrogation of the defendant concerning any participation by the latter in the commission of the crime imputed was indispensable to a professional determination of defendant's mental condition at the time of the offense charged. In the opinion of the psychiatrist the early age of the defendant did not of itself vitiate the probative efficacy of defendant's admissions nor their propriety.

In the instant case apart from the challenged testimony of the examining doctor as to defendant's incriminating admissions there is contained in the record evidence of an additional asserted admission of his guilt made by the defendant to another witness and certain circumstantial evidence which, if believed, would implicate the defendant in the charged offense.

In *State* v. *Aaron*, (1818), 4 N. J. L. 263, a defendant under the age of 11 years had been tried for the murder of a 2 year old child. An issue was whether a boy under

eleven years of age could be convicted upon his own confession. The Court had the following to say of cases wherein the capacity of a minor to commit a crime has been established.

> P. 279. "This capacity to commit a crime, it appears to the court, necessarily supposes the capacity to confess it. He who is a rational and moral agent and can merit the infliction of legal sanctions, must be able to detail his motives and acts; and must be judged by them. If therefore the defendant was of an age to be punished, he was of an age to confess his guilt. - - - -"

In *State* v. *Guild*, (1828), 10 N. J. L. 163 @ 189, the New Jersey court quoted with approval the passage from *State* v. *Aaron* set forth above and said:

> "The age of the prisoner was earnestly pressed on our consideration by his counsel, who strenuously insisted he was too young to be exposed on such evidence. At the perpetration of the offence he was aged twelve years and somewhat more than five months. The sound, sensible and legal rule on this head is, in our opinion, judiciously, as well as lucidly, stated by Justice Sutherland in the case of *Aaron*. (quotation as above) These principles are conformable to the most approved and respected authorities - - - -"

A 14 year old girl was indicted and tried for burning a dwelling house. Her confession was admitted in evidence. The Court in *Commonwealth* v. *Smith*, (1876), 119 Mass. 305, 311, said:

> "There was evidence that the dwelling house had been set on fire by some one, and there were facts and circumstances pointing to the defendant as the probable incendiary. After her arrest and while in custody, she confessed that she set the fire, and stated how she did it. This evidence was objected to, but as it did not appear that any threats or promises were made on the part of the officers, it

was properly admitted, and the fact, that the defendant was but fourteen years of age, and under arrest, and made the confession to officers, does not render it incompetent. - - - -"

In *State* v. *Watson*, (1946), 114 Vt. 543, 549, 49 A (2nd) 174, there is this statement:

"Finally the mere fact that a person is an infant and of low mentality does not render his confession inadmissible as being involuntary, providing he has the mental capacity to commit the crime with which he is charged. The reason for this rule being that if a child has such mental capacity as to render him amenable to the law for the commission of a crime he has sufficient mental capacity to make a confession of guilt. (authorities cited) - - - -"

It becomes difficult to say with confident discrimination whether in the case at bar we are concerned with an alleged confession or with admissions.

"- - - - A confession is the voluntary acknowledgment of the criminal act charged, or of participation in its commission. Incriminating admissions may be made without any intention of confession." *State* v. *O'Donnell*, 131 Me. 294, 301.

See authorities cited in *State* v. *Merrow*, (1965), (Me.), 208 A (2nd) 659, 660, 661; *State* v. *Robbins*, 135 Me. 121, 122, as to submission to the court and entertainment and resolution by it of ostensible extrajudicial confessions.

In *Hall* v. *State*, (1945), 209 Ark. 180, 189 S. W. (2nd) 917, the defendant, an adult, upon his own petition had been committed for observation as to his mentality. The Court held:

P. 921. "It is finally urged that it was error to permit Dr. Kolb to testify over his objections, that appellant confessed to him that he killed his wife. As we understand the contention, it is not based on the existence of the relation of physician

and patient, - - - but that he was sent to the State Hospital to be examined and his mental condition determined - - - and not to obtain a confession or other statement against his interest from him, and then to so testify in court. Said act provides - - - - that the judge shall in certain cases order the superintendent to direct some competent physician employed by the State Hospital 'to conduct observations and investigations of the mental condition of the defendant, and to prepare a written report thereof.' This was done by Dr. Kolb. By section 12, the physician who prepared the report shall be called to testify by either party and may be examined by either party. The Act does not prohibit the use of a confession, if one is obtained by the physician, and we see no valid objection to its use in this case, for in the first place, it is merely cumulative to his confession to many others; and in the second place, the doctor asked him if he killed his wife, which he admitted, for the purpose of asking him the further question, whether he had any remorse of conscience for having killed her. These and many other questions and answers, stenographic report of which was made at the time, were asked for the purpose of determining his sanity."

In *State* v. *Myers*, (1951), 220 S. C. 309, 67 S. E. (2nd) 506, 508, defendant over the objections of his counsel was committed by the Court to the State Hospital for examination as to sanity. The appellate Court held:

"We are not advised as to the methods used at the State Hospital in examining a person for sanity but may assume that such an examination is made in a manner consistent with the constitutional rights of the accused. We do not undertake now to define the limits of such rights except to say that the authorities of that institution will not be permitted, over the protest of the accused, to reveal any confession made by him in the course of such examination, or any declarations implicating him in the crime charged."

If the foregoing language is to be interpreted to assert that a defendant in the course of such a mental examination or observation can never advisedly and voluntarily waive his constitutional rights, the decision is manifestly ultra protective.

The age of the defendant above is not sufficient to void a confession validly made. *Olivera* v. *State*, (Okla.), 354 P. (2nd) 792, 794; *Com.* v. *Smith*, 119 Mass. 305, 311, nor by the same reasoning should age alone nullify an admission.

There are essential standards of fairness and the probity and integrity of extrajudicial confessions and admissions apart from an accused's age will additionally for their competency depend upon a defendant's intelligence, mental condition, disposition, treatment, existing circumstances and other conditions. 87 A L R (2nd) 624, ANNO.

> "But the question whether a particular confession offered in evidence was voluntary or was obtained by constraint or coercion - - - - is not a question of law. It is to be determined by evidence. The evidence upon this issue may be conflicting and confused. Even when the evidence is uncontradicted, different inferences may often be drawn from it by different men and each inference be logically possible. Hence, the question must be determined by the presiding justice as a question of fact. In 1 Greenl. Ev. 219. it is stated that the matter rests wholly in the discretion of the judge. Upon exceptions to his opinion on this question the law court should not reverse his decision merely because it would itself have come to a different conclusion, but only when the circumstances are such that it can say as matter of law, that the confession was not voluntary in the legal sense. It will regard the findings of the presiding justice upon this question of fact, as it does the findings of a jury upon questions of negligence, as entitled to stand unless the contrary inference is the only reasonable one. - - - -"
> *State* v. *Grover*, 96 Me. 363, 365.

This defendant in the case at bar had pleaded not guilty by reason of mental disease or mental defect and thereby undertook the burden of proof by preponderance, of the truth of such defense. *State* v. *Lawrence, supra,* 57 Me. @ 583. The State presented the psychiatric witness. Whether the defense would have called that witness we cannot know. Both parties doubtlessly knew before trial of the Doctor's data, findings and conclusions as to the defendant's indicative mental condition. The prosecution in its elective judgment had to consult its public duty and if the defendant's admissions (or confession) seemed competent the State's counsel had an obligation to his office to make certain of their submission to the Court at sometime during the trial.

The controversial testimony of the examining psychiatrist and the propriety of its acceptance for consideration by the court or by the court and jury as admissions or confessions upon the issue of the defendant's perpetration of the confirmed homicide presented only questions of fact. *State* v. *Grover, supra.* Such testimonial evidence was competent to be received by the court and the court or jury for determination as to whether such asserted admissions or confessions had been made and if so whether they were made voluntarily in the legal sense and with constitutional conformity and satisfaction.

WEBBER, J. (concurring). In the course of the State's presentation of its main case on the issue of guilt or innocence, there were introduced into evidence over respondent's objection damaging admissions made by him to the State's alienist during an examination ordered by the court. While I concur in the result and in the opinion of the court, I consider the issue raised by respondent's exception to the admission of this evidence of such importance as to require our determination.

The machinery for investigation of mental responsibility in criminal cases is provided by statute, 15 M.R.S.A., Sec. 101:

> "When a finding of probable cause has been made, or an indictment has been returned against a person, or a person has taken an appeal to the Superior Court, a Justice of the Superior Court upon petition, if a plea of insanity is made in court or the justice is notified that it will be made upon arraignment, may order such person committed to the custody of the Commissioner of Mental Health and Corrections to be placed in an appropriate institution for the mentally ill or the mentally retarded, to be there detained and observed by the superintendent, or his delegate, and professional staff until further order of court, *for the purpose of ascertaining the condition of the person."* (Emphasis mine)

It is my view that the public, acting through the legislature, is as much concerned with relieving the mentally ill from criminal responsibility as the respondent may be to establish his defense. Legislative intention will be completely frustrated if the patient may not with safety fully and candidly communicate with the examining physician. The question is of novel impression in Maine and no doubt arises at this time largely because of the particular wording of the so-called Durham Rule statute, 15 M.R.S.A. Sec. 102. "An accused is not criminally responsible if his unlawful act was the *product* of mental disease or mental defect. * * *." (Emphasis mine). This direct causative relationship between the mental disease or defect and the specific unlawful acts of the respondent creates the necessity, at least in the mind of the alienist, of a full disclosure by the respondent as part of the examination. Without this narration of the criminal acts, no appraisal of the relationship between mental condition and unlawful act is possible. Dr. Saunders, the State psychiatrist, made this abundantly clear in his testimony:

"Q. If an individual, Doctor, were committed to you for examination by you with respect to sanity or insanity, or mental disease or mental defect, and such person exercised the privilege of not answering your questions, or not speaking to you, would you still perform such examination?

A. No, sir. We would report back to the Court the fact as you outlined it. We would report back to the Court that the person had said he did not wish to answer any questions.

Q. Then I ask you as the next question, Doctor, if a person were committed to you for the purpose of your examination with respect to sanity or insanity, or mental disease or mental defect, and if such person refused to answer questions, or make statements, solely with respect to an alleged crime, and only that, would you still conduct an examination?

A. Yes, whatever he would let us do, we would do it, and report back whatever we did do.

Q. Now, whether or not, on the basis of an examination of an individual who answers questions directed to him by you, excluding any questions with respect to an alleged crime, could you come up with a finding of sanity or insanity?

A. Not in relation to the question which is asked of us. *We are asked to state whether the alleged unlawful act was the product of a mental disease or mental defect. In order to answer the question about the product we have to inquire into the circumstances.*" (Emphasis mine)

This necessity for disclosure virtually amounting to confession if the examination is to have any efficacy whatever creates an almost insoluble dilemma for counsel for a respondent. Does the law require him to make a choice between defending on the merits and defending by a showing of causative mental illness? I think not—and yet that is

the practical result if it be decided that the admissions requisite to an effective examination can become as in the instant case the State's most effective evidence of the guilt of the respondent. I would so construe Secs. 101 and 102 as to carry out what I believe reflects both legislative intent and the public interest.

The purpose, and in my view the only purpose, of the examination provided in Sec. 101 is clearly stated therein, i.e. "ascertaining the condition of the person." The statutory examination is not provided as a device by which the State may bolster its case on the issue of guilt or innocence. Moreover, if we permit the examination to be used improperly for the latter purpose, it will lose its entire effectiveness as a means of accomplishing its primary function, ascertaining whether unlawful acts were produced by mental disease or defect. It is not unreasonable to require that the State be able to prove guilt beyond a reasonable doubt without resort to the use of admissions or confessions made as a part of a court ordered mental examination. Otherwise, the statutory examination becomes unavailable to the vigilant and a trap for the unwary.

I am convinced, moreover, that the use of such evidence by the State to prove the guilt of the respondent amounts to a lack of governmental fair play. This is not to say that such evidence might not become admissible for a proper purpose during the course of a trial in which the respondent proffers evidence that the alleged unlawful acts were the product of mental disease or defect. One can, for example, readily envisage a situation in which the door might be opened by the nature of the cross-examination of a State psychiatrist by the respondent. It suffices to say that no such door was opened in this case.

There is little authority on the point. In *Hall v. State,* (1945) 209 Ark. 180, 189 S.W. (2nd) 917, the court permitted the confession obtained as part of the mental exam-

ination to be used against the respondent. The opinion noted that the confession to the examiner was "merely cumulative to his confession to many others." Whether or to what extent the court was influenced by this fact is nowhere apparent. The opinion does not consider the policy underlying legislative provision for court ordered examination and in my view is not persuasive.

*State* v. *Myers*, (1951) 220 S.C. 309, 67 S.E. (2nd) 506, 508, although decided on another point, contained the following pertinent dictum: "We are not advised as to the methods used at the State Hospital in examining a person for sanity but may assume that such an examination is made *in a manner consistent with the constitutional rights of the accused.* We do not undertake now to define the limits of such rights except to say that the authorities of that institution will not be permitted, over the protest of the accused, to reveal any confession made by him in the course of such examination, or any declarations implicating him in the crime charged." (Emphasis mine) I am satisfied that the "constitutional rights" which must not be abridged in such cases relate to due process of law and governmental fair play.

In *People* v. *Ditson*, (1962) 369 P. (2nd) (Cal.) 714, 732, the court recognized the dilemma facing a respondent under such circumstances but considered only whether there was an infringement of the right against self incrimination. The court noted that the respondent was not compelled to submit to examination and determined that he was not entitled to protection. The court gave no consideration to any public interest in having an effective examination made nor to any aspects of governmental fair play.

In *Killough* v. *U. S.*, (1964) (U. S. App., D.C.) 336 F. (2nd) 929, 932, the respondent was in jail awaiting trial. He was examined by a so-called Classification Intern for

the sole purpose of determining the proper classification and treatment of the prisoner during his detention. In the course of examination the respondent made a complete voluntary confession. The court found the purpose of the examination to be inherently confidential. Resting its decision entirely upon the concept of governmental fair play, the court reversed conviction because of admission of the confession thus obtained and ordered a new trial. At page 932 the court said:

> "The rule of fundamental fairness required by the due process clause in our view does not permit use of the incriminating statements made to the Classification Intern in a criminal prosecution under the circumstances present here.
>
> Indeed, in a somewhat comparable situation, that involving an examination pursuant to 18 U.S.C., Sec. 4244, into the sanity or mental competency of accused to stand trial, Congress has specifically provided that no statement made by the accused in the course of the examination 'shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.' The wisdom of and need for such a rule in that situation are obvious, and the rule has been recognized even when a statute does not so provide. (Footnote citation of dictum in State v. Myers, supra). * * *
>
> Incriminating statements obtained from the accused in the exercise of the classification function for purposes of proper treatment and care should not, we think, be admitted as evidence of his guilt, any more than such statements obtained in the course of a mental examination. *Not only would it be grossly unfair in the constitutional sense to admit them, but the Jail authorities might well be handicapped in the future in seeking information needed for proper classification, treatment, and care of the inmates."* (Emphasis mine)

It is true that where, as in the instant case, the respondent is a child of twelve, the State has the burden of

proving the capacity to commit a crime. But the State cannot justify its use of these admissions as necessitated by this requirement of proof. The capacity of such a respondent to commit a crime can be shown by competent and probative evidence entirely apart from highly prejudicial admissions obtained under the circumstances of the instant case. The admissions to the alienist come into play, if at all, only with relation to the causative link required by the so-called Durham Rule statute.

I conclude that the introduction of these admissions as a part of the State's main case on the issue of guilt or innocence violated the purpose and intent of the examination statute, deprived the respondent of due process of law and constituted reversible error.

WILLIAMSON, C.J. and MARDEN, J. concur.